**SEALED**                                                    **SEALED**

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
|  | ) |
| JONATHAN MARKOVICH; RICHARD WASERSTEIN; DANIEL | ) |
| MARKOVICH; CHRISTOPHER GARNTO; JOSE SANTEIRO; | ) |
| ANDREW LIEBERMAN; JEFFREY DRAESEL, JR.; ELAN (a/k/a | ) |
| ILAN) BAKHSHI; MARIO KUSTURA; FRANCISCO BOSCH | ) |
|  | ) |

Case No. 20-6469-MJ-HUNT

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____ April 1, 2017 to present ____ in the county of ____ Broward ____ in the

____ Southern ____ District of ____ Florida ____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to commit health care and wire fraud |
| 18 U.S.C. § 371 | Conspiracy to pay/receive kickbacks in violation of the Eliminating Kickbacks    In Recovery |
|  | Act, 18 U.S.C. § 220(a) |
| 18 U.S.C. § 1956(h) | Conspiracy to commit money laundering |
| 18 U.S.C. § 1957(a) | Money laundering |
| 18 U.S.C. § 1014 | False statements to a financial institution |
| 18 U.S.C. § 1344(2) | Bank fraud |

This criminal complaint is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Alberto Bhoge, FBI S.A.
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____ 09/25/2020 ____

_____
*Judge's signature*

City and state: ____ Fort Lauderdale, Florida ____

Hon. Patrick M. Hunt, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Alberto Bhoge, being duly sworn, do hereby and depose and state:

### I.     INTRODUCTION AND AGENT'S BACKGROUND

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been employed in this capacity since September 2018. I am assigned to the South Florida Health Care Fraud Strike Force, which consists of agents from the FBI and Health and Human Services, Office of the Inspector General ("HHS OIG"), along with attorneys from the Department of Justice and the United States Attorney's Office. The Health Care Fraud Strike Force is responsible for investigating health care related crimes.

2.     I am personally involved in conducting a joint investigation with other federal, state, and local law enforcement agencies into alleged criminal activities perpetrated by, among others, the following ten (10) individuals: (a) JONATHAN MARKOVICH ("J. MARKOVICH"), a co-owner of two entities that purport to provide treatment and therapy for substance abuse, Second Chance Detox, LLC (d/b/a Compass Detox) ("Compass Detox") and WAR Network, LLC ("WAR"), and the former CEO of Compass Detox; (b) RICHARD WASERSTEIN ("WASERSTEIN"), a co-owner of Compass Detox and WAR; (c) DANIEL MARKOVICH ("D. MARKOVICH"), the current CEO of Compass Detox and its former Compliance Officer; (d) CHRISTOPHER GARNTO ("GARNTO"), the Director of Operations ("DOO") of Compass Detox; (e) DR. JOSE SANTEIRO ("DR. SANTEIRO"), the Medical Director of Compass Detox and WAR; (f) DR. DREW LIEBERMAN ("DR. LIEBERMAN"), the Chief Medical Officer ("CMO") of Compass Detox; (g) DR. JEFFREY DRAESEL, JR. ("DR. DRAESEL"), a licensed chiropractor and the owner of Inner Strength Chiropractic & Rehab LLC ("Inner Strength Chiropractic"); (h) ELAN BAKHSHI (a/k/a Ilan Bakhshi) ("BAKHSHI"), a former employee of

1

Compass Detox and WAR; (i) MARIO KUSTURA ("KUSTURA"), a former employee of Compass Detox; and (j) FRANCISCO BOSCH ("BOSCH"), a former employee and contractor of Compass Detox.  The information is based upon a review of public and private records, interviews, and other investigative activities conducted by law enforcement personnel assigned to this case.

3.    I submit this Affidavit in support of a criminal complaint alleging the following crimes against the following individuals:

| Defendant | Role | Crime(s) Charged |
|---|---|---|
| J. MARKOVICH | Owner | • 18 U.S.C. § 1349 (Conspiracy to Commit Health Care and Wire Fraud);<br>• 18 U.S.C. § 371 (Conspiracy to Pay/Receive Kickbacks in Violation of the Eliminating Kickbacks in Recovery Act ("EKRA"), 18 § U.S.C. 220(a));<br>• 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering);<br>• 18 U.S.C. § 1014 (False Statements to a Financial Institution); and<br>• 18 U.S.C. § 1344(2) (Bank Fraud). |
| WASERSTEIN | Owner | • 18 U.S.C. § 371 (Conspiracy to Pay/Receive Kickbacks in Violation of EKRA);<br>• 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering); and<br>• 18 U.S.C. § 1957(a) (Money Laundering). |
| D. MARKOVICH | CEO | • 18 U.S.C. § 1349 (Conspiracy to Commit Health Care and Wire Fraud); and<br>18 U.S.C. § 371 (Conspiracy to Pay/Receive Kickbacks in Violation of EKRA). |
| GARNTO | Director of Operations | • 18 U.S.C. § 1349 (Conspiracy to Commit Health Care and Wire Fraud);<br>18 U.S.C. § 371 (Conspiracy to Pay/Receive Kickbacks in Violation of EKRA); and<br>• 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering). |
| DR. SANTEIRO | Medical Director | • 18 U.S.C. § 1349 (Conspiracy to Commit Health Care and Wire Fraud). |
| DR. LIEBERMAN | Chief Medical Officer | • 18 U.S.C. § 1349 (Conspiracy to Commit Health Care and Wire Fraud). |
| DR. DRAESEL | Chiropractor | • 18 U.S.C. § 1349 (Conspiracy to Commit Health Care and Wire Fraud). |
| BAKHSHI | Recruiter | • 18 U.S.C. § 371 (Conspiracy to Pay/Receive Kickbacks in Violation of EKRA). |

| Defendant | Role | Crime(s) Charged |
|-----------|------|------------------|
| KUSTURA | Recruiter | • 18 U.S.C. § 371 (Conspiracy to Pay/Receive Kickbacks in Violation of EKRA). |
| BOSCH | Recruiter | • 18 U.S.C. § 371 (Conspiracy to Pay/Receive Kickbacks in Violation of EKRA). |

4.      Because this Affidavit is provided for the limited purpose of establishing probable cause for arrest, I have not included all information known to me regarding this investigation, but rather have set forth only those facts necessary to establish probable cause to believe that the charged individuals have committed the charged offenses.

## II.      THE CHARGED OFFENSES

### 18 U.S.C. § 1349
### (Conspiracy to Commit Health Care Fraud and Wire Fraud)

5.      Federal law makes it a crime for anyone to knowingly and willfully execute or attempt to execute a scheme or artifice: (1) to defraud any health care benefit program or (2) to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by or under the custody or control of a health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services. 18 U.S.C. § 1347(a). Conspiracies and attempts to commit health care fraud also are violations of federal law. 18 U.S.C. § 1349.

6.      A "health care benefit program" is defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b).  In this case, Compass Detox, WAR, Inner Strength Chiropractic, and outside laboratories billed private insurance plans which fall within the definition of "health care benefit programs."

7.     Federal law makes it a crime for anyone who, having devised or intended to devise any scheme or artifice to defraud, to transmit or cause to be transmitted "by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343. Conspiracies and attempts to commit wire fraud also violate federal law.  18 U.S.C. § 1349.

## 18 U.S.C. § 371
### (Conspiracy to Pay/Receive EKRA Kickbacks)

8.     The federal Eliminating Kickbacks in Recovery Act ("EKRA"), enacted on or about October 24, 2018, makes it a crime for anyone to knowingly and willfully, (1) solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for referring a patient or patronage to a recovery home, clinical treatment facility, or laboratory; and (2) pay or offer any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind (A) to induce a referral of an individual to a recovery home, clinical treatment facility, or laboratory; or (B) in exchange for an individual using the services of that recovery home, clinical treatment facility, or laboratory, with respect to services covered by a health care benefit program, in and affecting interstate and foreign commerce.  18 U.S.C. § 220(a).  Conspiracies and attempts to pay and receive kickbacks prohibited by EKRA are also violations of federal law.  18 U.S.C. § 371.

## 18 U.S.C. § 1956(h)
### (Conspiracy to Commit Money Laundering)

9.     Federal law makes it a crime for anyone to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to do so.  18 U.S.C. § 1956(a)(1)(B)(i).

4

10.     Federal law also makes it a crime for anyone to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000. 18 U.S.C. § 1957(a).

11.     A specified unlawful activity includes any act or activity constituting an offense involving a Federal health care offense.  18 U.S.C. § 1956(c)(7)(F).

12.     A specified unlawful activity also includes wire fraud. 18 U.S.C. §§ 1956(c)(7)(A), 1961(1).

13.     Conspiracies to launder money in violation of 18 U.S.C. § 1956(a)(1)(B)(i) or 18 U.S.C. § 1957(a) are also violations of federal law.  18 U.S.C. § 1956(h).

## 18 U.S.C. § 1014
### (False Statements to a Financial Institution)

14.     Federal law makes it a crime for anyone to, among other things, knowingly make any false statement or report for the purpose of influencing in any way the action of any institution the accounts of which are insured by the Federal Deposit Insurance Corporation ("FDIC").  18 U.S.C. § 1014.

## 18 U.S.C. § 1344(2)
### (Bank Fraud)

15.     Federal law makes it a crime for anyone to, among other things, knowingly execute, or attempt to execute, a scheme or artifice to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.  18 U.S.C. § 1344(2).

### III.    THE DEFENDANTS AND RELEVANT ENTITIES

### A.  THE SUBSTANCE ABUSE TREATMENT PROGRAMS

#### Compass Detox

16.    According to materials obtained from the Florida Department of Children and Families ("DCF"), which regulates substance abuse treatment providers in Florida, Compass Detox is licensed with DCF to provide substance abuse treatment and services. Specifically, DCF first licensed Compass Detox to provide residential level 1 services and detox services on or about March 24, 2017.

17.    According to the Florida Department of Health, Compass Detox also maintains a Modified Institutional Class II Type B pharmacy license, number PH30742, which was issued on or about April 25, 2017, and expires in 2021. The license status is listed as "clear."

18.    Documents obtained from DCF reflect the following organizational chart for Compass Detox, effective as of in or around January 2020. As the chart shows, DR. SANTEIRO was the Medical Director with a reporting line to DR. LIEBERMAN, as Chief Medical Officer; DR. LIEBERMAN, in turn, reported to D. MARKOVICH, as CEO; D. MARKOVICH in turn reported to the owners (J. MARKOVICH and WASERSTEIN). (Other names are redacted.)

6



**WAR**

19.    According to materials obtained from DCF, WAR was initially licensed on or about

February 7, 2019 to provide day and night treatment with community housing, intensive outpatient,

and outpatient services.  As of on or about February 7, 2020, WAR remained licensed to provide

all three services under licenses set to expire in or around February 2021.  Its publicly available

website, wartreatment.com, also identifies "Oasis" as housing associated with WAR.[1]  Property

---

[1] Under Florida regulations, programs licensed to provide Day and Night Treatment with community
housing, as WAR is, are required to provide or manage community housing for their patients.  See Fla.
Admin. Code R. 65D-30.0081.

records and law enforcement surveillance confirm that Oasis is located at 116 SE 5th Avenue, Hallandale Beach, Florida 33009.

## B. **THE DEFENDANTS**

### Owners, Operators, and Employees of Compass Detox and WAR

20. WASERSTEIN and J. MARKOVICH, both residents of Miami-Dade County, organized Compass Detox and WAR, according to documents filed with the Florida Secretary of State, and, through various LLCs, co-own both Compass Detox and WAR. WASERSTEIN and J. MARKOVICH are brothers-in-law.

21. D. MARKOVICH, a resident of Miami-Dade County, became CEO of Compass Detox beginning in or around October 2019 (replacing J. MARKOVICH as CEO), and was formerly its Compliance Officer. D. MARKOVICH and J. MARKOVICH are brothers.

22. GARNTO, a resident of Miami-Dade County, has been employed in an "Admin" role at Compass Detox since on or about March 28, 2017, although banking records reflect payments from Compass Detox to GARNTO as early as fall 2016 for marketing. As of at least January 2020, GARNTO was Compass Detox's DOO, according to materials from DCF.

23. BAKHSHI, a former resident of Miami-Dade County, was employed by Compass Detox as a "Phone Tech" from on or about November 12, 2018 to on or about March 11, 2019, and at WAR as a behavioral health technician ("BHT") from on or about March 18, 2019 to on or about April 7, 2019. However, private social media (Facebook) chat messages reflect BAKHSHI recruiting patients to Compass Detox as early as in or around May 2017.

24. KUSTURA, a resident of Broward County, was employed by Compass Detox as an "Admission Coordinator" beginning on or about December 31, 2019 to a date unknown.

8

However, private Facebook chat messages reflect KUSTURA recruiting patients to Compass Detox as early as in or around April 2019.

25.     BOSCH was employed by Compass Detox from on or about February 3, 2018 to on or about May 31, 2018 and later worked for Compass Detox as a "contractor" for from in or around June 2018 to in or around July 2018.

### The Doctors

26.     Compass Detox's public website currently lists DR. SANTEIRO as the Medical Director and LIEBERMAN as CMO. DCF materials also identify DR. SANTEIRO as the Medical Director of WAR.

27.     According to the Florida Department of Health, DR. SANTEIRO, a resident of Miami-Dade County, is a Medical Doctor, License Number ME69516, which was issued on October 27, 1995. The license is clear and active and expires on January 31, 2022.

28.     DR. SANTEIRO was assigned U.S. Drug Enforcement Agency ("DEA") Registration Number BS4680220 on or about November 15, 1995. This DEA registration number was most recently renewed on or about January 30, 2020.

29.     On or about October 21, 2016, DR. SANTEIRO obtained his Practitioner-DW/30, a designation by the DEA that allowed SANTEIRO to treat up to 30 opioid-addicted patients using schedules III-V FDA-approved narcotics, such as buprenorphine, without having to obtain a separate DEA registration as a narcotic treatment program. On or about November 8, 2017, DR. SANTEIRO obtained his Practitioner-DW/100, allowing him to treat up to 100 opioid-addicted patients. On or about December 18, 2018, DR. SANTEIRO obtained his Practitioner-DW/275 registration, allowing him to treat up to 275 opioid-addicted patients; it expires February 28, 2023.

30.     According to the Florida Department of Health, DR. LIEBERMAN, a resident of Miami-Dade County, is a Medical Doctor, License Number ME58681, which was issued October 23, 1990. The license is clear and active and expires on January 31, 2022.

31.     Likewise, DR. LIEBERMAN was assigned DEA Registration Number BL9920679 on or about August 9, 2006. This DEA registration number was most recently renewed on or about February 2, 2018 and expires March 31, 2021.

32.     On or about August 15, 2017, DR. LIEBERMAN obtained his Practitioner-DW/30, allowing him to treat up to 30 opioid-addicted patients. On or about December 4, 2018, SAMHSA approved DR. LIEBERMAN to treat up to 100 opioid-addicted patients.

33.     Both DRS. SANTEIRO and LIEBERMAN prescribed many opioid-addicted patients buprenorphine[2] in the form of Suboxone, Subutex, and Zubsolv. From in or around 2017 to in or around 2020, DR. SANTEIRO prescribed at least 62,100 pills of buprenorphine and DR. LIEBERMAN prescribed at least 19,740 pills of buprenorphine.

**The Chiropractor**

34.     According to the Florida Department of Health, DR. DRAESEL, a resident of Miami-Dade County, is a chiropractic physician, license number CH9758, issued on or about August 7, 2009. DR. DRAESEL's license is clear and active and expires in or around March 2022.

---

[2] Buprenorphine is a Drug Enforcement Administration ("DEA") Schedule III opioid that is itself addictive and has a strong potential for abuse. It is the only medication approved for the treatment of opioid abuse disorder that can be dispensed by a pharmacy and used at home. Buprenorphine can suppress withdrawal symptoms, decrease opioid cravings, and block the effects of other opioids. Its use is heavily regulated at both federal and state levels. Suboxone and Zubsolv are commercial names for buprenorphine combined with naloxone, an opioid antagonist. Subutex is the commercial name for buprenorphine without naloxone. Clinicians are responsible for ensuring that medications like buprenorphine, with high potential for misuse, diversion, and abuse, are used with caution to ensure patients are taking them appropriately and not diverting them.

35.     On or about July 13, 2009, documents were filed with the Florida Secretary of State effectively organizing Inner Strength Chiropractic & Rehab LLC ("Inner Strength Chiropractic"), located in Bay Harbor Island, Florida.  The articles of organization identify DR. DRAESEL as a manager of Inner Strength Chiropractic.

## C. <u>THE CLINICAL LABORATORIES</u>

36.     The investigation has revealed that bodily fluid samples from Compass Detox and WAR patients are referred to numerous outside laboratories for various forms of testing.

### Laboratory Pros, LLC

37.     On or about May 26, 2016, articles of organization were filed with the Florida Secretary of State effectively organizing Laboratory Pros, LLC ("Laboratory Pros") in Miami, FL (later Deerfield Beach, FL).  GARNTO was added as Laboratory Pros' manager in or around September 2016 and the only other manager was removed in or around June 2017.  In or around May 2018, GARNTO signed documents filed with the Florida Secretary of State removing himself as the manager of Laboratory Pros, and adding Mended Bridge Investments, LLC ("Mended Bridge Investments") as manager.  GARNTO is the registered agent and manager of Mended Bridge Investments.

### Lab 1 – Lab 6[3]

38.     According to records on file with the Florida Secretary of State, Lab 1 is located in Deerfield Beach, Florida.  Lab 1 had a financial relationship with Laboratory Pros.

39.     According to records on file with the Florida Secretary of State, Lab 2 is located in Sunrise, Florida.

---

[3] Laboratory Pros, and Lab 1 – Lab 6, are hereinafter referred to as "the Clinical Laboratories."

40.     According to records on file with the Florida Secretary of State, Lab 3, Lab 4, Lab 5, and Lab 6 are located in Miami, Florida.

## D.  ADDITIONAL RELATED ENTITIES RELEVANT TO MONEY LAUNDERING ALLEGATIONS

41.     According to documents filed with the Florida Secretary of State: on or about December 5, 2016, Waterstone Healthcare Management, LLC ("Waterstone Healthcare Management"), a company located in Bay Harbor Islands, FL, was organized by WASERSTEIN. Waterstone Healthcare Management has two different companies as members—one, Asakim 18, LLC ("Asakim 18"), located in Surfside, FL, was organized on or about December 5, 2016, and is managed by J. MARKOVICH; the other, Waterstone Capital Management, LLC ("Waterstone Capital Management"), organized on or about December 28, 2012, is located in Bay Harbor Islands, FL, and is managed by WASERSTEIN.

42.     On or about July 13, 2017, WASERSTEIN filed documents with the Florida Secretary of State organizing Right Direction Recovery, LLC ("Right Direction Recovery"), located in Bay Harbor Islands, FL.  Waterstone Healthcare Management is a manager of Right Direction Recovery.

43.     On or about October 23, 2018, WASERSTEIN filed articles of incorporation with the Florida Secretary of State effectively organizing Ness Group Foundation, Inc. ("Ness Group Foundation") as a non-profit corporation located in Bay Harbor, FL.  Article III states that Ness Group Foundation "is a not for profit corporation organized exclusively for charitable, religious, educational, and scientific purposes."  The same article further notes that "[n]o part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered

12

to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in this Article III."

44.    On or about February 22, 2019, WASERSTEIN filed documents with the Florida Secretary of State applying for authorization for Jade Holdings Delaware, LLC, a foreign limited liability company, to conduct business in Florida as Jade Holdings LLC ("Jade Holdings"). The managers of Jade Holdings were identified as J. MARKOVICH and WASERSTEIN.

45.    On or about February 11, 2016, documents were submitted to the Florida Secretary of State effectively organizing Recovery Empire, LLC ("Recovery Empire") as a limited liability company located in Miami with GARNTO as an authorized member. GARNTO has since been identified as a manager of Recovery Empire.

46.    On or about October 30, 2017, J. MARKOVICH filed documents with the Florida Secretary of State effectively organizing Yeladim 18, LLC ("Yeladim 18") as a limited liability company located in Bal Harbour (later Surfside), FL. These documents identified J. MARKOVICH as a manager for Yeladim 18.

## IV.    BACKGROUND ON DRUG AND ALCOHOL REHABILITATION

### A.  SUBSTANCE ABUSE TREATMENT

47.    Based on my training and experience, I know that substance abuse treatment is regulated under state and federal law.

48.    Substance abuse treatment regulations describe a continuum of care including, from most intensive to least intensive, detox, residential treatment, partial hospitalization ("PHP")[4],

---

[4] DCF, which regulates and licenses treatment facilities in Florida, refers to PHP as Day or Night Treatment. These terms may be used interchangeably in this Affidavit. In a Day Night or Treatment with Community Housing program, room, board, and transportation are provided by the program, but only for PHP patients.

13

intensive outpatient ("IOP"), and outpatient ("OP"). The varying levels of treatment provided are based on the severity of the addiction and the patient's symptoms.

49.     Detox facilities assist patients in dealing with the effects of withdrawal from the complete cessation of using drugs and/or alcohol. After successfully completing detox or other inpatient services, patients receive treatment for their underlying addiction in the form of outpatient care, through either PHPs, IOPs, and/or OPs. PHP, IOP, and OP patients attend facilities on an ongoing basis where treatment is rendered, generally in the form of group and individual therapy sessions. The distinction among the three different treatments plans relates to, among other things, the amount of therapy time on a daily or weekly basis.

50.     Medical and osteopathic doctors play an essential role in substance abuse treatment. Without a doctor, patients at the substance abuse treatment centers would not receive prescriptions for drugs, receive treatment, or have urine, blood, or other bodily fluid testing. Bodily fluid tests, which are prescribed by the doctors, are billed to health plans by the substance abuse treatment centers and/or laboratories, as are patient evaluations performed by a physician.

51.     DCF licenses and oversees addiction treatment facilities that provide detox, residential treatment, PHP, IOP, and OP programs in Florida. Florida state regulations govern substance abuse treatment services, including standards for detox, residential treatment, PHP, IOP and OP. Fl. Admin. Code §§ 65D-30.006, 65D-30.0081, 65D-30.0091 and 65D-30.010. One of the requirements that DCF places on certain facilities is that they have a medical director.

52.     In Florida, substance abuse treatment services are governed by the "Hal S. Marchman Alcohol and Other Drug Services Act" ("the Marchman Act"), Fl. Stat. § 397.301. Under the Marchman Act, private substance abuse service providers' policies regarding payment for services have to comply with federal and state law. Fl. Stat. § 397.431.

14

53.     All "clinical treatment" under the Marchman Act must be "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle." Fl. Stat. § 397.311(26)(a).

### B. FEDERAL GUIDELINES FOR SUBSTANCE ABUSE TREATMENT

54.     The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA"), also promulgated guidelines for varying levels of treatment based on the severity of the addiction, including, for purposes of this affidavit, detox and IOP.

55.     The American Society of Addiction Medicine ("ASAM") is a professional medical society representing over 6,000 physicians, clinicians, and associated professionals in the field of addiction medicine. ASAM published the ASAM Criteria, which was a collection of objective guidelines that give clinicians a way to standardize treatment planning and where patients are placed in treatment, as well as how to provide continuing, integrated care and ongoing service planning, including for detox, PHP, IOP, and OP treatment services.

56.     One form of treatment for substance abuse involves the use of a prescription controlled opioid, buprenorphine, in order to wean addicts off of illegal opioids, including heroin. Because drugs containing buprenorphine are Schedule III controlled substances, meaning that there is a strong potential for abuse, resulting in fatal and non-fatal overdoses, prescribing physicians also must have two DEA registrations. The first registration is the standard "DEA number," required to prescribe any controlled substance. The second registration is a "DEA X-number," which is granted to a limited number of physicians with valid "DEA numbers," who

have completed a training program on substance abuse treatment and have fulfilled other regulatory requirements.

57.     The Drug Addiction Treatment Act ("DATA") of 2000 amended the Controlled Substances Act to permit physicians to treat opioid addiction using Schedules III-V, FDA-approved narcotic drug products without having to obtain a separate DEA registration as a narcotic treatment program. Those registered with the DEA as DATA-waived physicians could treat 30 or 100 patients at any one time. In 2016, Congress passed the Comprehensive Addiction and Recovery Act ("CARA"), which amended the Controlled Substances Act to permit nurse practitioners and physician assistants registered with the DEA to also treat opioid addiction based on state authority. In 2016, the Department of Health and Human Services published a Federal Register Notice which increased the patient limitation to 275 for physicians.

### C. PAYMENT FOR SUBSTANCE ABUSE TREATMENT

58.     Insurance coverage for substance abuse treatment and urine drug testing (and blood testing) is available through a number of avenues, including, but not limited to, the following private insurance companies:  Aetna Health Management LLC and Aetna Life Insurance for Members ("Aetna"), Blue Cross/Blue Shield ("BCBS"), Cigna Healthcare ("Cigna"), Magellan Health Inc., Medical Mutual, United Behavioral Health and United Health Group, Inc. ("United"), and Optum Health ("Optum") (collectively referred to hereinafter as the "Insurance Plans"). The Insurance Plans offer health care coverage directly to consumers and through employers, including ERISA and non-ERISA plans. They also manage health care plans offered to federal employees. The Insurance Plans cover medical and clinical treatment costs of rehabilitation in accordance with the terms of their policies and state and federal law, including requirements that addiction treatment services and testing be medically necessary.

16

59.     According to banking records and records obtained from the Insurance Plans: (i) Compass Detox, WAR, Inner Strength Chiropractic, and the Clinical Laboratories electronically submitted claims, via interstate wires from within the Southern District of Florida, to the Insurance Plans located outside of the State of Florida, to bill for substance abuse treatment and/or urine drug tests, among other things, for Compass Detox and WAR patients; and (ii) all of the Insurance Plans paid Compass Detox and WAR during the relevant period via interstate wires.

### D.   BODILY FLUID TESTING IN SUBSTANCE ABUSE TREATMENT

60.     Urine drug testing (and blood testing) are one monitoring strategy used by substance abuse treatment centers to detect recent drug or alcohol use by a patient. There are two primary categories of urine drug testing: immunoassay testing (e.g., a drug screen or point of care ("POC") testing) and specific drug identification (e.g., definitive, or confirmatory testing).

61.     POC urine testing involves collecting urine in a specific cup designed for testing. The specimen is analyzed using a color band or numbered dipstick, allowing for visual positive or negative results. POC urine testing usually tests for the presence of 9 to 13 specific types of drugs. POC tests typically cost between $5 and $10 and can be read easily by a layperson. This testing is convenient, and less costly, and the results can be read quickly. POC testing is the most common form of urine testing performed at treatment facilities.

62.     Definitive (or confirmatory) urine drug tests use gas liquid chromatography-mass spectrometry ("LCMS") and/or gas chromatography, or high-performance liquid chromatography, to analyze the urine specimen. These techniques are highly sensitive, and accurately and definitively identify specific substances and the quantitative concentrations of the drugs or their metabolites. This testing is more precise, more sensitive, and detects more substances than other types of urine testing. Results of definitive testing take longer, and the tests are significantly more

17

expensive; single urine specimens that undergo drug screen analyzers and LCMS testing can be billed to insurance companies for thousands of dollars.

63.     Insurance plans often provide guidance to service providers, including physicians, substance abuse treatment centers, and laboratories, on the type and frequency of testing that will be reimbursable. This guidance is based on policy statements from ASAM, publications by experts in the area of substance abuse treatment, and federal and state policies.

64.     To bill insurance companies for urine drug testing and other bodily fluid testing, substance abuse facilities often submit claims on Form CMS 1450, also known as the Health Insurance Claim Form ("HICF"), to the client's respective insurance company. Before billing for the urine drug test, providers must first obtain a prescription from the patient's medical doctor, who must deem the UA medically necessary. HICFs contain, among other information, the client's name and biographical information, his or her insurance information, diagnosis, date and place of service, the standardized procedure codes, the number of units provided, the total dollar amount being charged and name and location of the billing company. The procedure code and the unit volume assist in determining the dollar amount at which the client's insurance company will reimburse the provider. Completed HICFs can be printed and mailed to insurance companies or they can be submitted electronically. When the HICF is submitted, the provider certifies that the contents of the HICF are true, correct, and complete.

### V.     PROBABLE CAUSE TO BELIEVE CRIMES HAVE BEEN COMMITTED

#### A.  OVERVIEW OF THE CRIMINAL CONDUCT

65.     Based on evidence set forth below, along with my training and experience, I submit that there is probable cause to believe that many of the claims that (i) Compass Detox and WAR submitted to the Insurance Plans for reimbursement for detox, residential treatment, PHP, IOP and

OP services, (ii) urine drug testing and blood testing claims submitted by the Clinical Laboratories for Compass Detox and WAR patients, and (iii) chiropractic services claims submitted by DR. DRAESEL and Inner Strength Chiropractic for Compass Detox and WAR patients, were false and fraudulent. More specifically, the EKRA, health care fraud and wire fraud, and money laundering conspiracies operated as follows:

a. Patient brokers, including GARNTO, BAKHSHI, KUSTURA, and BOSCH, often recruited patients to Compass Detox and WAR in exchange for illegal kickbacks and bribes, such as flights, cash, and drugs/alcohol. These kickbacks were often directly financed by J. MARKOVICH, D. MARKOVICH, and GARNTO;

b. Having obtained a patient population at Compass Detox and WAR, sometimes through kickbacks, J. MARKOVICH, D. MARKOVICH, GARNTO, DR. SANTEIRO, DR. LIEBERMAN, and DR. DRAESEL engaged in a wide ranging and varied health care fraud scheme;

c. Conspirators gave patients illegal drugs prior to admission and/or re-admission to Compass Detox to cause these patients to test positive for drugs and qualify for detox—the highest and most expensive level of care—when such care was not medically necessary, and was based on a material omission;

d. Patients were often routinely recycled from Compass Detox to WAR and back for the purposes of billing them for multiple stays without regard to whether such repeated treatment was working or whether the billed level of care was medically necessary. For example, patients who relapsed in outpatient programs at WAR would be sent back to Compass Detox for detox, even if a lower level of care was more appropriate;

e. Patients used illegal drugs while at Compass Detox and WAR and positive tests for drugs had no consequences, and did not change patients' treatment plans. As long as they had insurance that paid, patients who tested positive for drugs were allowed to stay;

f. Conspirators gave patients scheduled medications and a "comfort drink" to keep them docile and compliant while enrolled for treatment. These medications were prescribed in dangerous quantities and combinations, had no therapeutic benefit, jeopardized the patients' recovery, and rendered addiction treatment ineffective by impeding patients' abilities to meaningfully participate in therapy;

g. Conspirators billed for treatment and other services that were not rendered, chiefly expensive therapy sessions that never occurred or which patients did not attend;

h. Even if patients did attend the therapy sessions that were billed, these therapy sessions were nonetheless fraudulently billed because they often were so substandard as to be essentially

19

meaningless, were given by unqualified personnel, and many patients were so intoxicated on illegal drugs, controlled substances, and/or the comfort drink that they could not meaningfully participate.

i.  The conspirators submitted and caused to be submitted false and fraudulent billings for expensive, excessive, and medically unnecessary urine drug tests (and blood tests) for Compass Detox and WAR patients referred to the Clinical Laboratories, including Laboratory Pros, which is owned by GARNTO and which paid J. MARKOVICH. These billings were fraudulent because the testing ordered by the conspirators was excessive and medically unnecessary, including because the tests were not reviewed in a timely manner or appropriately utilized in patients' treatment at Compass Detox and WAR;

j.  The conspirators systematically referred patients to DR. DRAESEL for medically unnecessary chiropractic services following falsified chiropractic referrals generated by Compass Detox staff, and DR. DRAESEL systematically billed for chiropractic services purportedly provided to Compass Detox patients, even though those services were often medically unnecessary or, sometimes, not provided;

k.  WASERSTEIN, J. MARKOVICH, and GARNTO extracted fraud proceeds for their personal gain, use, and benefit, often by funneling money into numerous shell companies disguised as "management" or "consulting" payments, or as charitable contributions.

l.  J. MARKOVICH falsified applications for Paycheck Protection Program loans on behalf of Compass Detox and WAR by representing that these entities were not engaged in unlawful practices, when in fact they were, in order to obtain approval for such loans.

66.  Through the fraud scheme described above, the conspirators submitted or caused

to be submitted substantial amounts of billings to the Insurance Plans:

a.  **Compass Detox Billings**: For service dates of on or about April 1, 2017, to on or about April 11, 2020, Compass Detox submitted approximately $68,573,120 in claims to the Insurance Plans and received approximately $22,535,194 in payment.

b.  **WAR Billings:** For service dates of on or about February 8, 2019, to on or about April 10, 2020, WAR submitted approximately $6,984,189 in claims to the Insurance Plans and received approximately $1,616,465 in payment.

c.  **Clinical Labs Billings**: DR. SANTEIRO, as Medical Director for Compass Detox and WAR, authorized excessive laboratory testing for patients from Compass Detox and WAR, which resulted in approximately $15,040,292 in claims submitted through the Clinical Labs for service dates from on or about April 1, 2017, to on or about April 11, 2020, and approximately $1,142,185 in payments to the Clinical Labs.

d. **Chiropractic Billings:**  For service dates of on or about July 31, 2017, to on or about October 13, 2019, DR. DRAESEL submitted or caused to be submitted approximately $588,230 in claims to the Insurance Plans, and received approximately $155,003 for services supposedly provided to Compass Detox and WAR patients.

e. **Total Billings:**   Adding these amounts together, the volume of claims that J. MARKOVICH, D. MARKOVICH, GARNTO, DR. SANTEIRO, DR. LIEBERMAN, and DR. DRAESEL submitted, and caused to be submitted, is approximately <u>$91.2 million billed</u>, and approximately <u>$25.4 million paid</u>.

### B.   EVIDENCE OF CONSPIRACY TO PAY AND RECEIVE EKRA KICKBACKS

67.     Based on evidence set forth below, along with my training and experience, I submit that there is probable cause to believe that J. MARKOVICH, WASERSTEIN, D. MARKOVICH, GARNTO, BAKHSHI, KUSTURA, BOSCH, and others engaged in a kickback conspiracy to obtain patients for Compass Detox and WAR.

#### 1.   Witness Interviews Regarding Kickbacks

68.     Numerous confidential witnesses, including former patients and employees at Compass Detox and WAR, provided statements to federal agents regarding kickbacks. In sum, as further described below, these witnesses describe GARNTO as the lead patient recruiter for Compass Detox, with other individuals such as BAKHSHI and KUSTURA working under him. Kickbacks provided and offered to patients from GARNTO, BAKHSHI, KUSTURA and BOSCH included cash payments to attend Compass Detox or WAR, inter-state flights financed by GARNTO, D. MARKOVICH, J. MARKOVICH or Compass Detox's corporate accounts, and illegal drugs or other in-kind items.

#### Information Provided by Patients

a. Patient 1 learned of Compass Detox through KUSTURA, who told Patient 1 that he/she/they could get paid $1,000 per month to attend if he/she/they had insurance. GARNTO also directed KUSTURA to solicit people with good insurance. Patient 1 was paid in cash by KUSTURA, who obtained the money from GARNTO. While Patient 1 was a patient at WAR, KUSTURA also provided him/her/them with drugs, including drugs

21

from which he/she/they overdosed, as more fully described in the subsection of this Affidavit devoted to health care fraud evidence.

b. Facebook chats obtained during the investigation corroborate information from Patient 1. For example, on October 30, 2018, Patient 1 messaged KUSTURA stating, "Am I gunna get paid n for sure have a place to go?" KUSTURA reassured Patient 1, "Yes im paying you me and [name redacted] just go to compass." Also within this conversation thread, KUSTURA reassured Patient 1 that "Im gonna send you my boys number an hes gonna take care of getting you down here an in here since I wont have my phone. +1(786) 515-5474." KUSTURA informed Patient 1 that this number belonged to "Frankie," and "yea I just talked to him he can fly you down asap." "Frankie" is known to agents as BOSCH, just as the number listed in this chat is known as BOSCH's phone number.

c. Patient 2 stated that KUSTURA arranged a flight for Patient 2 and his/her/their significant other from California to Miami, Florida on August 20, 2019. KUSTURA arranged their flight, and a ride-share to the airport. KUSTURA also sent them small amounts of cash to buy alcohol, and to cover their baggage fee. Flight and banking records confirm that $288 of flights were purchased for these patients by D. MARKOVICH on his personal account ending in x3684. Records reflect that a ride-share was ordered on GARNTO's ride-share account on August 20, 2019, with a pickup location in or around Huntington Beach, California and a drop off location near the airport in Santa Ana, California, a few hours before the departure time of the flight purchased by D. MARKOVICH. There was no expectation that Patient 2 ever repay KUSTURA or anyone at Compass Detox.

d. Patient 3 stated that KUSTURA paid Patient 3 and his/her/their significant other small sums of cash through wire transfers in exchange for attending Compass Detox and referring other patients. Text messages from Patient 3's phone reflect KUSTURA providing details on these wire transfers: On April 22, 2019, KUSTURA stated "From-mario kustura 438-381-5965 ... 100 [dollars]... Whats your guys eta to compass?" Later, on May 30, 2019, KUSTURA messaged to say, "Hey guys its Mario just checking on you guys where you at? ... Chris wanted me to take over whats going on he said everyone was supposed to be there." KUSTURA then followed up with a message indicating "From mario kustura 60 [dollars] 381-650-3750." Wire transfer data corroborates that, on April 22, 2019, KUSTURA wired $100 to Patient 3, and that on May 30, 2019, KUSTURA wired $60 to Patient 3. For both of these transactions, the wire transfer data shows that KUSTURA's address is Compass Detox.

e. In addition, Patient 3 and his/her/their significant other remained at Compass Detox for about two weeks in Spring 2019 on the promise that they would be paid by GARNTO and KUSTURA, although they never were. Approximately a month after they were discharged from Compass Detox, in or around May 2019, KUSTURA offered Patient 3 and his/her/their significant other $1,500 to return to Compass Detox, which they did, but they discharged themselves against medical advice the next day and never received the money.

f. Patient 4 stated that GARNTO was the lead marketer, but usually communicated with patients through lower level recruiters such as BAKHSHI and KUSTURA or patients who

were "in" with GARNTO. For example, on one occasion, another Compass Detox patient, Patient Broker 1, paid Patient 4 $60 at the direction of GARNTO.

g. Patient 5 was paid between $500-$1,000 for 14-21 day stays at Compass Detox. Although GARNTO used to pay patients directly, he started using "Mario" (known to agents as KUSTURA) and "Elan" (known to agents as BAKHSHI) to meet patients and pay them.

h. Compass Detox also paid to fly Patient 5 to Florida from New York. Flight information reflects several flights purchased by GARNTO and D. MARKOVICH using credit card nos. x3004 (held in the name of DANIEL MARKOVICH), x3684 (held in the name of DANIEL MARKOVICH), and x0305 (held in the name of CHRISTOPHER GARNTO) for Patient 5. In total, Compass Detox and WAR billed approximately $312,268 to BCBS for services purportedly provided to Patient 5, while outside labs billed approximately $103,250 for urine drug and blood testing.

i. Patient 6 stated that, while at Compass Detox with his/her/their significant other, Patient 6 got to know another patient ("Patient Broker 2") who was in a relationship with a member of Compass Detox's nursing staff ("Nurse 1"). Patient Broker 2 approached Patient 6 about whether he/she/they would be willing to leave Compass Detox and come back as one of Patient Broker 2's recruits in exchange for money. Patient 6 declined because he/she/they believed that "Chris G" (known to agents as GARNTO) would pay more money.

j. Patient 7 stated that Compass Detox is a scam because marketers pay patients to go there. "Mario" (who agents know as KUSTURA) promised Patient 7 $1,500 to attend Compass Detox for two weeks and WAR for 30 days. However, KUSTURA never paid.

**Information Provided by Employees**

k. Confidential Witness 1 ("CW1"), a former employee of Compass Detox's nursing staff, stated that D. MARKOVICH and GARNTO frequently arranged flights for out-of-state patients and gave out Visa gift cards to patients. In addition, D. MARKOVICH would allow patients to attend Compass Detox for free if they brought with them another patient with insurance (a practice known to me as "piggybacking").

l. Confidential Witness 2 ("CW2") a former employee of Compass Detox, stated that WASERSTEIN, J. MARKOVICH, and GARNTO asked CW2 to help set up a call center for BAKHSHI to run as part of the efforts to recruit patients. The call center was set up in WASERSTEIN's office in Bal Harbor, then moved to a house in Surfside that WASERSTEIN owned but allowed BAKHSHI and other employees to live in.[5]

---

[5] CW2 further explained that WASERSTEIN owned the building where WAR and Oasis, the associated community housing, were located. Property records confirm that Jade Holdings LLC and Ness Group LLC, which are managed by WASERSTEIN, purchased the property on which WAR and Oasis are located in or around 2019 and 2018, respectively. WASERSTEIN also owned a home in Surfside, Florida, which was essentially used as community housing for WAR patients before Oasis was available. This location was shut down because patients were not supervised and were exchanging sex for drugs and money.

BAKHSHI called Compass Detox "alumni" to try to get them to come back to Compass Detox, or names on a spreadsheet of individuals with drug-related court cases that WASERSTEIN provided. In addition, on one occasion, CW2 saw BOSCH give a patient an expensive pair of Giuseppe Zanotti shoes.

m. Confidential Witness 3 ("CW3"), a former employee of Compass Detox's nursing staff, stated that "Chris"—whose last name CW3 did not know— promised goods to patients, including sneakers and controlled substances, to lure them into being admitted to Compass Detox. In a three-month time frame, "Chris" recruited approximately 160 patients that were admitted to Compass Detox. CW3 believed that patients were paid to attend Compass Detox, recalling one occasion where three patients left Compass Detox against medical advice to use drugs, and returned later to gather their personal belongings and were angry that they did not get paid. CW3 stated that Compass Detox changed which urinalysis lab they used twice during the time that CW3 worked at Compass Detox. Initially, Compass Detox used a lab whose owner would refer patients to Compass Detox. But since the individual did not refer enough patients, Compass Detox moved to a different lab.

n. Cooperating Defendant 1 ("CD1"), who was charged with patient brokering by state authorities and has not yet been convicted or sentenced, owned Lab 6, which was one of the labs utilized by Compass Detox in early 2017 for urinalysis samples. CD1, who also operated a treatment center, agreed to refer patients to Compass Detox, and did in fact refer several patients to Compass Detox in or around early 2017. Compass Detox sent urinalyses samples exclusively to Lab 6 for a few months in 2017, but J. MARKOVICH and GARNTO (who CD1 understood was the primary marketer for Compass Detox) both told CD1 that other labs had offered to pay them in exchange for referring urinalyses samples and that they would move Compass Detox's lab account away from Lab 6 if CD1 did not pay. CD1 declined to pay for referrals, and GARNTO moved the account to Lab 1 as a result. Furthermore, WASERSTEIN informed CD1 that he had started a call center in Bay Harbor Islands. The purpose of the call center was to recruit patients for Compass Detox.

o. In addition, CD1 hired BOSCH in the summer of 2018 to recruit for his/her/their treatment center. BOSCH's patients primarily came from Compass Detox and some of those patients told CD1 that BOSCH paid them to get high after they left Compass Detox so they would be admitted to CD1's facilities. CD1 did not like this practice and suspected that BOSCH was still working for Compass Detox, so CD1 confronted BOSCH about this. BOSCH admitted that he was being paid by Compass Detox to get patients high.

---

WASERSTEIN later transferred ownership of this location to GARNTO as payment for GARNTO's services to Compass Detox. Property records confirm that, in or around April 2020, WASERSTEIN, through a company he manages, quit claimed this property (which it had purchased from another WASERSTEIN company for approximately $635,000) to GARNTO.

## 2.  **Additional Evidence of Kickbacks**

69.     Banking, financial transfer, wire, and flight data reveal the following: (a) Compass Detox owners or employees purchased at least 111 flights for patients that correspond to a date of service at Compass Detox or WAR, totaling approximately $29,917.  Of these, roughly 73 flights were purchased in or after November 2018, totaling approximately $16,895.  These flights were purchased on various accounts in the name of D. MARKOVICH, GARNTO, and Compass Detox (for which J. MARKOVICH is the signatory); and (b) GARNTO, BAKHSHI, KUSTURA, and BOSCH conducted at least 105 wire or cash transfers to patient brokers or to patients within approximately one month or less of the patient's date of service at Compass Detox or WAR, totaling approximately $14,684.  Eighty-two of these payments (totaling approximately $12,244) occurred in or after November 2018.

70.     Call detail records obtained from Sprint for phone number (516) 673-8726, known to be used by BAKHSHI, show that BAKHSHI's phone number communicated with phone numbers that patient files indicate belong to at least 27 Compass Detox patients through text message; and with phone numbers that patient files indicate belong to at least 88 Compass Detox patients though voice call.

71.     Call detail records obtained from AT&T for (201) 452-7776, known to belong to GARNTO, show that GARNTO's phone number communicated with phone numbers that patient files indicate belong to at least 330 Compass Detox patients via text; and 415 Compass Detox patients via call.

72.     Call detail records further confirm that GARNTO exchanged thousands of texts or calls with J. MARKOVICH and BAKHSHI, and hundreds of texts or calls with D. MARKOVICH

and BOSCH. And call detail records show that BAKHSHI exchanged hundreds of calls or texts with J. MARKOVICH and BOSCH, and dozens of calls or texts with D. MARKOVICH.

73.    In addition, Facebook chats reveal numerous instances where GARNTO, BAKHSHI, and KUSTURA communicated with Compass Detox and WAR patients, including offering kickbacks in exchange for attending Compass Detox and WAR. For example:

a. On October 2, 2017, BAKHSHI complained to another Facebook user that "Chris G owes me 3 bands. ... He owes me money for clients. ... Hes [sic] owes me money since I been there." Based on my experience, I understand "bands" can be a reference to $1,000 in cash.

b. On March 6, 2018, a Facebook user told KUSTURA that, "That kick back shit is fucked up ... and illegal ... And places get shut down for that lol." KUSTURA responded that "ik [I know]." The Facebook user then inquired whether KUSTURA "got paid for clients," to which KUSTURA responded, "Ehh cant confirm or deny."

c. On April 28, 2018, BAKHSHI asked Patient 8 to "help me with client u already know the deal ... I got u heavy if u help me out."

d. On November 5, 2018, Patient 9 complained to BAKHSHI that, "I hate this business bro I always be getting dicked around when I can send people a few times a month." BAKHSHI reassured the patient that, "Nah we bout to get u right baby," but the patient insisted "Chris deaded me before." BAKHSHI later stated "Keep sending il make sure u get right ... I told u rack 21 days." In my experience, a "rack" can refer to $1,000 in cash. Patient 9 responded, "I ain't shakin wit u I'm shakin wit Chris son."

e. On January 15, 2019, Patient 10—who insurance billing records indicate is the single highest utilized patient by Compass Detox and WAR in terms of billed amount—messaged BAKHSHI to say "I'm thinking about coming back down. Tell Jonathan to pay me for a visit."

f. On April 28, 2019, KUSTURA told Patient Broker 3, a known recruiter for Compass Detox and other substance abuse treatment centers, specific kickback rates depending on the type of insurance: "Blue cross-200 Cigna-300 United-400 Aetna-500."

g. On July 5, 2019, Patient 11 asked BAKHSHI to pay his/her/their kickback, stating, "You told me 350 ... If you have a card you can send it over facebook ... But you know [C]hris isn't gonna hand me bread like that." BAKHSHI responded to "Text me."

h. On February 25, 2020, Patient 10 messaged GARNTO to inform him that "I got someone else he's got United health care" and included a picture of two individuals'

insurance cards. GARNTO responded, in relevant part, "Let me know when you three are ready bro. [Patient name redacted] would be good for u."

### 3.  Specific Examples of Kickbacks

74.     The investigation has revealed specific examples of kickbacks based on flight and

banking records, billing records, and patients' files:

a. On or about March 13, 2019, D. MARKOVICH purchased a flight for Patient 12 in the amount of approximately $508 from Dallas-Fort Worth to Fort Lauderdale on account x3684, held in the name of D. MARKOVICH. The flight date was March 13, 2019 and flight records reflect that Patient 12 boarded the flight. Billing records indicate that Compass Detox billed for services provided to this patient beginning on or about March 14, 2019.

b. On or about March 14, 2019, KUSTURA transferred $200 via wire to Patient 13. Billing records indicate that Compass Detox billed for services purportedly provided to this patient from on or about March 1, 2019 through on or about March 11, 2019, as well as on or about March 19, 2019 through on or about March 26, 2019. In total, Compass Detox and WAR billed approximately $623,294 to BCBS for services purportedly provided to Patient 13, while the Clinical Labs billed approximately $191,746 for testing conducted during Patient 13's stays at Compass Detox and WAR.

c. On or about June 6, 2019, BOSCH transferred $125 via wire to Patient 14. Billing records indicate that Compass Detox billed for services purportedly provided to this patient beginning on or about June 1, 2019 through on or about June 5, 2019. In total, Compass Detox billed approximately $225,382 to BCBS for services purportedly provided to Patient 14, while Clinical Labs billed approximately $32,080.

d. On or about June 20, 2019, GARNTO transferred $600 to BAKHSHI via financial transfer application. BAKHSHI was actively recruiting patients during this time period, as evidenced by the fact that, on June 27, 2019, BAKHSHI transferred $100 via wire to Patient 15, who was a Compass Detox and WAR patient in this time frame.

e. On or about November 1, 2019, GARNTO transferred $1,000 to Patient 16 from account ending in x9530 in the name of GARNTO. Patient files indicate that Patient 16 was enrolled at WAR at the time of this payment. In total, Compass Detox and WAR billed approximately $701,832 for services purportedly provided to Patient 16, while Clinical Labs billed approximately $97,372 for testing conducted during Patient 16's stays at Compass Detox and WAR.

f. On or about December 30, 2019, GARNTO booked a flight for approximately $442 for Patient 17 from Nashville to Fort Lauderdale. The flight date was December 31, 2019, and flight records indicate that the patient boarded the flight. The flight was purchased on credit card ending in x1077 held in the name of Compass Detox, under an account for which J. MARKOVICH is the signatory. Patient files indicate that Patient 17

purportedly received services from Compass Detox from in or around December 31, 2019 to in or around January 22, 2020.

### 4. Laboratory Pros Payments to GARNTO, J. MARKOVICH, and WASERSTEIN

75.     As described in subsection C below, Compass Detox and WAR referred excessive and medically unnecessary urinalyses to the Clinical Labs, including Laboratory Pros, in which GARNTO has a financial interest.

76.     GARNTO also disbursed money from Laboratory Pros to J. MARKOVICH and WASERSTEIN.  Banking records reflect that GARNTO has received a total of approximately $217,907 from Laboratory Pros' account x2645, of which he is a signatory, in the form of checks addressed to Mended Bridge Investments and deposited in Mended Bridge Investment's account x3563, and that J. MARKOVICH has received approximately $193,835 from Laboratory Pros' account x2645 in the form of checks addressed to Yeladim 18 and deposited in Yeladim 18's account x1358.  And on or about April 30, 2018, GARNTO signed a check from Laboratory Pros for $7,500 addressed to Company 1, of which WASERSTEIN is a director according to records on file with the Florida Secretary of State.  The check's memo stated, "deposit repayment."

### C. EVIDENCE OF HEALTH CARE FRAUD AND WIRE FRAUD CONSPIRACY

77.     Based on evidence set forth below, the kickback evidence discussed above, and my training and experience, I submit that there is probable cause to believe that J. MARKOVICH, D. MARKOVICH, GARNTO, DR. SANTEIRO, DR. LIEBERMAN, and DR. DRAESEL, and others, submitted and caused to be submitted false and fraudulent claims for reimbursement via interstate wire to the Insurance Plans for detox, residential treatment, PHP, IOP, and OP services, and for urine and blood testing.

28

### 1.    **Expert Consultant's Findings**

78.    The law enforcement team investigating this matter consulted with an expert in addiction treatment, Dr. Kelly J. Clark.  Dr. Clark is a licensed Medical Doctor (M.D.) in Florida (and in several other states), and has a Master's in Business Administration (M.B.A.).  She has over 20 years of experience in the addiction treatment field; is board-certified in addiction medicine and psychiatry; is a distinguished fellow of the American Psychiatric Association and the American Society of Addiction Medicine; has been a Chief Medical Officer for two multi-state addiction treatment companies; and worked on various national guidelines establishing the standards of care for addiction treatment and testing.  Since April 2019, Dr. Clark has served as the Immediate Past President of the American Society of Addiction Medicine (and was a former President), and remains on its Board.

79.    Dr. Clark recently provided expert testimony at trial in the Southern District of Florida in two cases regarding allegations of addiction treatment fraud, one of which was against a physician (United States v. Abovyan, Case No. 18-CR-80122- MIDDLEBROOKS (physician defendant); United States v. Ahmed, Case No. 19-CR-60200-COHN) (owner and executive of sober homes and addiction treatment facility). Dr. Clark has been retained as an expert in other addiction treatment fraud cases and was admitted as an expert witness after a Daubert hearing on June 26, 2019 (United States v. Snyder, et al., Case No. 18-CR-80111-ROSENBERG). Finally, Dr. Clark has been noticed as an expert in a case against the owners and operators of another substance abuse treatment facility (United States v. Port, et al., Case No. 19-CR-20583-SINGHAL).

80.    Dr. Clark reviewed a subset of Compass Detox and WAR patient records and billing claims (for Compass Detox and WAR, and several of the Clinical Laboratories).  Dr. Clark

29

found that Compass Detox and WAR did not meet the standard of care for addiction treatment. Instead, she concluded Compass Detox and WAR seemed designed to bill Insurance Plans for exorbitant amounts, and to retain the patient population by providing patients with prescribed drugs to misuse, in order to generate revenue by billing these patients' insurance for services.

81.     Of note, Dr. Clark identified the following patterns within the materials she reviewed:  prescribing by DR. LIEBERMAN and DR. SANTEIRO of medication for the over-sedation of patients (dispensed by staff); cycling of patient admissions between Compass Detox and WAR with no attempts to assist the patients in breaking this cycle; inappropriate referral orders and claims for chiropractic care; a large list of "prn" (or "as needed") medications available, which were improperly given and misused by patients; large billings for each day of "treatment," and lack of documentation of the delivery of the minimal care required to bill as a licensed facility for a given level of care; lack of utilization of the results of urine drug tests or blood tests for any medical purpose; and a lack of documentation of any physician's meaningful oversight of the patient's care.  Further, Dr. Clark identified patterns of billings for services not provided, including medically monitored detox when there was no medical monitoring of care; residential levels of care whether or not the reported patient actually received the amount of counseling services required; PHP services whether or not the patients actually engaged in the required number of therapy hours; and clinical care provided by individuals without the expertise or credentials to provide that care.

82.     With respect to medications, Dr. Clark found that DRS. LIEBERMAN and SANTEIRO engaged in a pattern of allowing patients to be over-sedated with "as needed" medications, which often resulted in patients complaining of being too tired or sedated, sweating or dizziness upon standing, restless as though they could not sit still, nausea, confusion, and other

complaints. The patients displayed objective signs consistent with medication side effects, such as abnormal blood pressures and pulses, sweating, agitation, and other signs. The staff would often note that patients had "slurred speech," "unsteady gait," missed groups due to lack of energy, napped during the day, fell asleep in group, or even that they had bizarre thoughts and delusions. Despite presenting these signs of medication toxicity days and even weeks after admission to Compass Detox, staff typically framed these as "withdrawal" symptoms. Such patients were not brought to the attention of the physicians or medical staff, and the physicians did not proactively conduct regular rounds on patients at Compass Detox. Dr. Clark found that this pattern of ordering and prescribing grossly diverged from legitimate medical practice and was unsafe, unethical, and inconsistent with the legitimate use of medication treatment in inpatient facilities. Dr. Clark further found that DRS. SANTEIRO and LIEBERMAN overutilized Subutex, the most abusable version of buprenorphine, among other non-sensical practices in these doctors' buprenorphine prescriptions.

83.      Indeed, Dr. Clark found that the practice at Compass Detox was to prescribe a "Comfort Drink," which was a 30ml liquid containing some varying concoction of two to five sedating substances. Patients could have this typically twice a day, although sometimes more often, for complaints such as "anxiety," "withdrawals," or "insomnia." Dr. Clark found this practice grossly inappropriate. The process of drinking a liquid shot of a concoction when "anxious" is the opposite of helping a person with addiction achieve sobriety. The individualized formulations of these shots of "Comfort Drink" are inappropriate and dangerous, given the large number of drug interactions possible, and risk of adverse reactions to a literal overdosing of those medications which have the potential to cause serious injury and even death.

84.     Dr. Clark found a pattern of patients being asked to sign a Durable Power of Attorney for all financial matters for a one-year period following admission to Compass Detox and WAR.  J. MARKOVICH often signed these forms days after the patient, stating that he is a notary public.  Dr. Clark found the practice of requiring or asking patients to provide a durable power of attorney delegation to be extremely unusual, much less such a request to such a vulnerable unemployed, and often homeless population being treated for addiction.

85.     Dr. Clark found that Compass Detox and WAR repeatedly tested patients' urine for a wide range of substances, including drugs of abuse they were known to have requested of and been given by staff, with bills typically $1,200 to $3,750 per urine sample.  Dr. Clark identified several patterns indicating that urine tests were typically not medically necessary:  ordering very large confirmatory panels including substances without misuse potential, like Prozac; ordering very large definitive panels including for medications which are misused but were being documented as dispensed to the patient; too frequent testing, such as multiple times a week, before results could be reviewed to justify subsequent tests; the results of testing were not used for medical decision-making or treatment of the patient; and a lack of clinical responses to any results of the tests by the treatment program staff.  Finally, Dr. Clark found a pattern of blood work ordered by Compass Detox and WAR physicians, which resulted in billings to the Insurance Plans, without clear clinical indications or medically necessity.

## 2.     Evidence of Substance Abuse Treatment Fraud From Witnesses and Supported by Patient Files and Billing Records

86.     Numerous confidential witnesses, including former employees and patients at Compass Detox and WAR, provided statements to federal agents regarding the fraudulent practices at these facilities, as detailed below.

87.     Furthermore, an outside consultant analyzed a sample of approximately 10-15% of patients' files for Compass Detox and WAR, as well as related billing records. This analysis revealed a number of potentially fraudulent trends, many of which are presented below along with specific examples evidencing the trends from Compass Detox and WAR's electronic medical records ("EMRs") and billing records. These trends and examples further support probable cause of a widespread health care and wire fraud conspiracy and confirm the witness accounts.

88.     This section summarizes witness statements and corresponding trends and examples from EMRs and billing records that provide evidence of the numerous fraudulent trends explained in Section V.A (Overview) above.

### Non-Medical Defendants Drove Medical Decisions, And the Doctors Were Insufficiently Involved in Treatment

89.     Consistent with Dr. Clark's findings, former employees and patients noted that the Medical Director (DR. SANTEIRO), who witnesses say was rarely at Compass Detox or WAR, and Chief Medical Officer (DR. LIEBERMAN), often engaged in improper conduct at Compass Detox and WAR, including allowing the owners and operators of these facilities, including D. MARKOVICH, J. MAKROVICH, and GARNTO, who were not physicians, to make treatment decisions based on insurance reimbursement, and not patient care, as explained below:

a.  CW1 indicated that DR. SANTEIRO, the Medical Director, was rarely at Compass Detox, and that it was a challenge to get him to come see patients. CW2 indicated that DR. SANTEIRO barely saw or interacted with patients. In addition, GARNTO would direct DR. LIEBERMAN to order nursing staff to give patients additional medication, a practice of which J. MARKOVICH and D. MARKOVICH approved.

b.  Further, CW 1 noted that D. MARKOVICH, who was not a medical professional, decided whether patients would be discharged or moved to a new level of care, and those decisions were based on what insurance would pay for. D. MARKOVICH instructed the utilization review team to try to get more days of treatment covered by a patient's insurance, even over the nursing staff's objections that the patient should be stepped down to a lower level of care. D. MARKOVICH also allowed unruly and physically aggressive patients, that were previously removed, back into Compass Detox. D. MARKOVICH accepted patients

33

into Compass Detox where one patient had great insurance and the other patient had no insurance.

c. CW2 further noted D. MARKOVICH attended utilization review meetings every morning, the purpose of which was to determine which patients stayed, and which were discharged. D. MARKOVICH had the final say about this, and his decision was based on the quality of the patient's insurance.

d. Confidential Witness 4 ("CW4"), a former Compass Detox employee, indicated that D. MARKOVICH and GARNTO—neither of whom are medical professionals—decided how long patients would stay at Compass Detox, and that this was based on the quality of a patient's insurance.

e. Confidential Witness 5 ("CW5"), a former Compass Detox employee, recalled a meeting where J. MARKOVICH and DRS. SANTEIRO and LIEBERMAN tried to find ways to increase the amount of treatment days that insurance would pay for. J. MARKOVICH told clinical staff, among others, to keep patients longer.

90.     In addition, Confidential Witness 6 ("CW6") has worked as an insurance billing consultant for Compass Detox and WAR since in or around 2017. J. MARKOVICH hired CW6 and, at some point, J. MARKOVICH became more involved with WAR and D. MARKOVICH took over operating Compass Detox. D. MARKOVICH set up an online share folder where he would upload patient files and other information that CW6 used to do the billing. CW6 relied on the information provided to him/her/them by D. MARKOVICH, J. MARKOVICH, and the utilization review employees to perform billing for Compass Detox and WAR.

### Billing for Therapy Not Provided, Not Attended, Or Substandard

91.     <u>Witness Statements:</u> Former employees and patients have described instances of therapy not being provided (because, for example, patients were taken out on a yacht instead of provided therapy); therapy not being attended; and substandard therapy, including therapy provided by unqualified individuals. For example:

a. Patient 4 stated that therapy at Compass Detox was sporadic and sometimes consisted of watching YouTube videos.

b. In Patient 2's experience, therapy at Compass Detox was conducted just to check a box. Sometimes, the employees facilitating therapies left a group of patients alone in a room to do an activity or assignment without facilitating a group therapy discussion. If patients got worked up during therapy sessions or started to complain, staff would bring in a tray of comfort drinks—described further below—to settle patients down. Likewise, WAR therapy was "wasted hours sitting in a room," consisting of activities such as coloring.

c. Patient 7 stated that therapy at Compass Detox was not mandatory and many therapists did not care about providing quality therapy. At WAR, although therapy was mandatory, patients could have their phone and leave to go outside. Sometimes therapists took patients on outings, such as to the beach, instead of providing therapy. And patients could use marijuana at WAR and staff would look the other way.

d. Confidential Witness 7 ("CW7"), a former WAR employee, noted that although CW7 was not licensed to perform therapies, CW7 was instructed to perform therapies at WAR multiple times a day. About 70% of the time, WAR's clinical director, who was licensed, was not present or supervising the therapies that CW7 facilitated, yet still signed off on therapy notes. The clinical director instructed CW7 to essentially cut and paste to create the therapy notes and, for IOP patients, to mark them as attending the therapy as long as they were in the building somewhere.

e. Confidential Witness 8 ("CW8") is a former Compass Detox and WAR employee who was a therapy intern and therefore not licensed to provide therapy unless supervised by a licensed therapist, which CW8 often was not. Compass Detox and WAR were profit driven, and the goal was to get patients in the door and make sure Compass Detox and WAR could continue to bill the patients' insurance. As a result, therapy was an afterthought and only existed because it is a required service to be able to bill insurance. There were no consequences at WAR if patients did not improve. The patients could—and in fact did—come back through Compass Detox and WAR over and over again, despite doing nothing to recover.

f. For example, CW8 relayed that, at WAR, where therapy is supposed to be the primary service, the main focus was simply completing notes, not the quality of therapy because, as the clinical director informed CW8, if they did not get the notes done, then they could not bill insurance. Therefore, the clinical director instructed CW8 to mark patients present, as long as they were somewhere in WAR's building, even if they were not actually in the room where therapy occurred or they otherwise refused to participate.

g. In one instance, when CW8 worked at Compass Detox, the clinical director instructed CW8 and other employees to complete over 90 missing therapy notes even for sessions they did not facilitate. On four to five instances, while CW8 worked at WAR, CW8 was instructed to pick up the patients and take them to yacht. No therapy was conducted on the yacht. Among others, J. MARKOVICH was on the yacht with the patients.

h. Confidential Witness 9 ("CW9") was employed at WAR but left after finding WAR's operations to be so substandard. The first time CW9 arrived to conduct a therapy session,

CW9 observed patients lounging on couches, with female patients sitting on male patients' laps or laying on top of them. In CW9's view, WAR was not set up to provide therapy but rather as, in essence, a day care. On another occasion, one patient was noticeably high when CW9 arrived to WAR.

92.     Trends & Examples: The EMRs and billing records confirm witness information concerning therapy services not rendered, improper documentation of therapy services, inadequate therapy, or therapy provided by underqualified individuals. These findings are significant both because Compass Detox and WAR falsely billed for therapy sessions that were not in fact provided or not adequately provided, but also because the primary service required under Florida regulations for residential treatment (Compass Detox), and PHP, IOP, and OP (WAR) is therapy.

a.  Among the approximately 11,854 group therapy notes present in the EMR for the Compass Detox and WAR sample patients, patients were absent approximately 43% of the time.

b.  While the WAR group therapy notes in the sample population reveal a higher rate of purported attendance than do the Compass Detox notes in the sample population, the WAR group therapy notes evidence that WAR billed for inadequate and insufficient therapy services, as well as therapy not rendered. Among other problems identified in the WAR therapy notes, on multiple occasions, WAR therapy notes document that patients played cards, played on their phones, played on the computer, colored, slept, or simply refused to participate in the therapy, yet the same therapy notes indicate that the patients had actively listened, were receptive to feedback, and/or were compliant with group rules.

c.  For example, on or about December 2, 2019, through on or about December 6, 2019, claims data obtained from BCBS indicate that WAR provided intensive outpatient therapy of at least three hours a day and at least three days a week to Patient 18, which would be the minimum amount of therapy required under Florida regulations for IOP services, in which Patient 18 was enrolled. WAR billed approximately $5,550 for this claim. However, patient files reflect that the patient received no group therapy during this week. Specifically, the patient files contain no group therapy notes for December 3, 5, or 6, 2019 for this patient and the therapy notes show the patient sleeping through or otherwise not participating in a mere three hours of therapy sessions on December 2 and December 4, 2019. In total, among this patient's multiple enrollments at Compass Detox and WAR, Compass Detox and WAR billed approximately $681,610 to BCBS for services purportedly provided to this patient, while Clinical Labs billed approximately $148,315 for testing conducted during this patient's stays at Compass Detox and WAR.

**Over-Medication Trends and Examples**

93.     Witness Statements:  Consistent with Dr. Clark's findings, former employees and patients consistently describe how Compass Detox patients were regularly provided with a "Comfort Drink" and prescription drugs, to keep them docile and compliant, and to entice them to remain at Compass Detox in order to keep getting such medications.  Some examples of such testimony, and a photograph of Compass Detox's "Comfort Drink," are described below:

   a. CW1, a former member of Compass Detox's nursing staff, noted that DR. LIEBERMAN concocted the "Comfort Drink," which CW1 understood included Benadryl, and other medications.  Other witnesses noted their understanding that the Comfort Drink contained Benadryl, and a muscle relaxer.

   b. CW2 further noted that DR. LIEBERMAN came up with the "Comfort Drink" and tried different mixtures to change its effect on patients.  CW2 recounted an instance where a patient took a comfort drink and started hallucinating, attempting to use Chapstick as a telephone to place an order for food.

   c. Confidential Witness 10 ("CW10"), a licensed pharmacist, was a pharmacy consultant for Compass Detox.  On multiple occasions, CW10 identified issues with medications at Compass Detox, and flagged these issues in monthly reports for Compass Detox (a copy of which CW10 left at the pharmacy station and faxed to an email address that employment records indicate belongs to SANTEIRO's son, who is a Compass Detox employee and CEO of WAR).  Nonetheless, the issues CW10 flagged were never resolved.  For example, CW10 observed the "Comfort Drink" as several ounces of a green liquid, pictured below in a photo taken by CW10.



CW10 noted that the Comfort Drink was advertised at Compass Detox outside of the station where medications were distributed. A sign informed patients that they could not have their Comfort Drink until after they completed group therapy. CW10 asked nursing staff about the Comfort Drink but no one would tell him/her/them what was included. Although CW10 informed the director of nursing that the Comfort Drink was an improper form of compounding, it continued to be distributed to patients.

d. Confidential Witness 11 ("CW11"), a licensed practical nurse, and former Compass Detox employee, noted that DR. LIEBERMAN made it standard for patients to be able to request a Comfort Drink every three to eight hours. CW11 observed that patients who were heroin users particularly liked the Comfort Drink, since it had a sedative effect.

e. Numerous patients have described the effect of the Comfort Drink on them or other patients as heavily sedating. And Patient 7 noted that, whenever he/she/they would leave Compass Detox, Patient 7 would be sick for several days because he/she/they would not have access to the Comfort Drink.

f. CW4 worked as a behavioral health technician at Compass Detox, and reported that Compass Detox patients often looked like they were heavily sedated. For example, shortly after receiving medications, CW4 would see patients slumped over with their cigarettes burning holes in their pants.

g. Confidential Witness 12 ("CW12") was employed on the nursing staff at Compass Detox. CW12 reported that patients were never fully weaned off their medications. If patients complained to the owner (J. MARKOVICH) about not getting their medications, they would then be given the medications that they wanted. CW12 was concerned about this, and other practices pertaining to medication, because this enabled the patient to remain dependent on medications and drugs.

h. CW3 noted that patients also complained to J. MARKOVICH about being denied more drugs by nursing staff. J. MARKOVICH would either call or come into Compass Detox to tell the RN or Medical Director to give the patients the drugs.

i. CW1 observed that patients frequently asked for additional doses of medication simply because they appeared to want it, not because they were presenting with symptoms that warranted it. When CW1 pushed back on these requests, patients turned to GARNTO or another recruiter who would call DR. LIEBERMAN to override nursing staff and provide the additional medication. As a result, patients were heavily sedated. Although CW1 confronted J. MARKOVICH and D. MARKOVICH about this practice, it never seemed to change and CW1 was met with resistance. Both J. MARKOVICH and D. MARKOVICH tried to convince CW1 that "one extra dose won't hurt" the patient.

94.     Trends & Examples:  The EMRs and billing records also confirm witness testimony described above about the use of the "Comfort Drink" to keep patients docile, and the overmedication of patients at Compass Detox.

a.  Based on a review of a sample of Compass Detox patient files, approximately 97% of the sample patients with dates of service dated in or around August 2018 or later were prescribed the comfort drink (also referred to in patient files as "comfort meds").

b.  Of those, DR. LIEBERMAN issued approximately 92% of the orders and DR. SANTEIRO issued approximately 8%.

c.  The Compass Detox patients in the sample also received orders, typically from DR. LIEBERMAN or DR. SANTEIRO, for anywhere from one to 57 medications upon admission.  In at least 100 instances in the sample, patients received orders for at least 40 different medications in a single admission to Compass Detox.

d.  For example, Patient 19, one of the highest utilized patients at Compass Detox and WAR in terms of the amount these entities billed insurers, was admitted for the fifth of eleven times to Compass Detox on or about August 6, 2019.  On August 8, 2019, as one example, the patient was administered at least eight different medications ordered by DR. LIEBERMAN, including antihistamines, anxiolytics, anticonvulsants, antipsychotics, anti-depressants, the comfort drink, and Subutex.  Given all of these medications, it is not surprising that, three days later, DR. SANTEIRO described the patient's "mental status" as follows: "extreme sedation. slurred speech poor balance, stumbling. difficulty staying awake."  DR. SANTEIRO assessed the patient as "impaired" and recommended to "reduce meds," yet subsequent notes describe the patient as "sedated," "sleeping" throughout the day and "missing groups," "[c]onstantly seeking meds and a way to 'not feel.'"

95.     Witness Testimony About Fraudulent Detox and Use of Illegal Drugs:  Former employees and patients at Compass Detox and WAR detailed how patients were given illegal drugs by patient recruiters, including some of the defendants, prior to admission or re-admission to ensure they qualified for detox.  The owners and operators of these facilities were told about this. Patients frequently used illegal drugs at Compass Detox and WAR, often with no consequences nor changes in their treatment.  These drugs not only provided a fraudulent basis for admission, but worked as a kind of kickback to get patients to attend these facilities, and to entice them to stay there.  Examples of such testimony include:

a. CW2, a former employee of Compass Detox,[6] noted that multiple patients at Compass Detox told CW2 that BOSCH supplied them with drugs.  CW2 confronted J. MARKOVICH and WASERSTEIN about this multiple times, but the pair liked BOSCH and kept him on.  After about six months of CW2 complaining, J. MARKOVICH and WASERSTEIN stopped allowing BOSCH to come inside Compass Detox, but still allowed him to recruit and drop off patients there.

b. CW2 further noted that a fellow Compass Detox employee told CW2 that BAKHSHI and another employee sold drugs to WAR patients.  CW2 was concerned about this and confronted J. MARKOVICH, who confirmed this was happening but indicated he instructed the employees not to do that anymore.  CW2 ultimately left Compass Detox because he/she/they grew increasingly frustrated about these practices.

c. CW3 reported that Compass Detox provided benzodiazepines to patients so they would test positive and thus be eligible for detox.

d. CW7 recalled that patients were permitted to smoke marijuana at OASIS (WAR's community housing).

e. Patient 20 witnessed J. MARKOVICH provide his/her/their significant other with $25 to leave Compass Detox and get high in summer 2017.  Whenever the couple wanted to return to Compass Detox, they would contact GARNTO, who instructed them that they could not return if they were "clean."  GARNTO would send someone to pick them up in Compass Detox's black SUV, and purchase heroin or alcohol for them to get high before returning.

f. Before coming to Compass Detox, Patient 2, and another prospective patient with whom Patient 2 was in a relationship, contacted KUSTURA, who sent them small sums of money for drugs or alcohol so that they would be admitted to detox when they arrived.  Before arriving at Compass Detox, KUSTURA instructed them to exaggerate how much they had been using in the past few days so that they would get more medication.

g. In or around April 2019, GARNTO sent Patient Broker 2 and Nurse 1 to pick up Patient 3 and his/her/their significant other from another detox, get them high, and bring them to Compass Detox.

h. GARNTO told Patient 5 and another Compass Detox patient that they had to have "dirty" urine before they could come back to Compass Detox, and GARNTO provided the money to accomplish this.

i. Patient 7 gave "Mario" (known to agents as KUSTURA) small sums to get Patient 7 drugs, with the understanding that Patient 7 would use those drugs to get readmitted to Compass

[6] CW2 may have criminal exposure for supplying drugs and/or alcohol to patients under the direction of J. MARKOVICH and GARNTO, but has not been charged.

Detox. As described in the kickback section, "Mario" also offered to pay Patient 7 to attend Compass Detox and WAR.

96.     The use of illegal drugs to patients to ensure admission was inherently dangerous.

Indeed, at least two Compass Detox patients overdosed (and fortunately survived) on the illegal

drugs recruiters provided by conspirators.

a. For example, Patient 21 was a Compass Detox patient along with his/her/their significant other. Patient 21 got to know Patient Broker 2, who was in a relationship with Nurse 1. On or about March 13, 2019, Patient Broker 2 left Compass Detox to get high and returned with marijuana, which Patient 21, Patient Broker 2, and other patients smoked in the courtyard of Compass Detox, and later they all went to buy more. Compass Detox's clinical director kicked Patient 21 and his/her/their significant other out the next day, and claimed that their discharge was against medical advice. Patient 21 and his/her/their significant other went to a Wal-Mart and called Nurse 1 for help, who put them up in a hotel for the night. The following day, Nurse 1 drove Patient 21, Patient 21's significant other, and Patient Broker 2 to Overtown in Miami to purchase drugs. Patient Broker 2 got out of the car and purchased several small baggies of illegal drugs.

b. Patient 21 snorted his/her/their potion and woke up in the hospital the next day, where, according to patient files, Patient 21 had been unresponsive upon arrival and required two shots of Narcan to revive. The hospital records reflect that the substance Patient Broker 2 purchased for Patient 21 was fentanyl. GARNTO transferred $1,000 to Nurse 1 from Mended Bridge Investments' account ending in x3563 the day before Nurse 1 drove Patient 21 to obtain the fentanyl.

c. Likewise, Patient 1 stated (which police records obtained by law enforcement confirm) that he/she/they overdosed in the bathroom of a gas station with heroin that KUSTURA gave him/her/them. KUSTURA, who was present for the overdose, was arrested on the scene for his possession of cocaine, and his criminal case is pending in Broward County. The arresting officer reported that KUSTURA had a syringe in his pocket. Patient 1 was also paid to get high by KUSTURA while at WAR so that he/she/they could be readmitted to Compass Detox for detox. Patient estimated that this occurred 3-4 times over 10 months.

**Patient Recycling and Examples**

97.     Witness Testimony About Patient Recycling: Former employees and patients noted

that the same patients were frequently readmitted and recycled to Compass Detox and WAR,

maximizing revenue in a recurring loop in which their treatment was not modified despite the fact

that it clearly was not working, as explained below:

a. CW1 described Compass Detox as a revolving door for patients, recalling specific patients who had multiple admissions during CW1's tenure. CW1 felt was no planning for a

patient's eventual discharge and, when patients were discharged, they were often sent to facilities or programs known to be "drug-infested," where they would often relapse and return to Compass Detox.

b. CW2 noted that any patient that ultimately relapsed at WAR would end back up at Compass Detox; J. MARKOVICH and GARNTO endorsed this practice.

c. Confidential Witness 13 ("CW13") was a nurse at Compass Detox. CW13 noticed at least 30 patients that had continuously been recycled through Compass Detox, and would at times "piggyback" off other patients' insurance if they did not have insurance themselves (especially if the patients were in a relationship).[7]

d. Confidential Witness 14 ("CW14") was employed at Compass Detox and at WAR. CW14 stated that Compass Detox had a number of "frequent flyer" patients and that it was basically a "hotel" for patients where patients could do whatever they wanted, including leave and come back, as long as they had good insurance.

e. Confidential Witness 15 ("CW15") witnessed patients coming back to Compass Detox shortly after leaving, some up to three times, which CW15 found excessive since the facility opened in April 2017.

f. CW5 was employed on Compass Detox' utilization review staff. Patients at Compass Detox were recycled frequently, and they wanted more drugs when they came back to Compass Detox.

g. CW7 could not think of a single patient at WAR who actually got better after attending WAR. To the contrary, nearly all of the patients were recycled back to an inpatient facility, mostly to Compass Detox.

98.   Trends & Examples: EMRs and billing records support statements from witnesses, described above, concerning the practice of recycling patients through Compass Detox and WAR, and of admitting patients to detox—the highest level of care—when not medically necessary because patients were often supplied drugs just prior to admission.

a. According to the EMRs, approximately 411 patients were admitted to Compass Detox two or more times, with 237 of those having at least three admissions, and 92 having five or more admissions.

---

[7] CW13 also recalled patients who were kicked out if their insurance stopped paying for treatment or had run out, and, when that happened, the patients would be dropped off at or near a hospital even if they had not finished treatment.

b.  For example, on or about July 26, 2019, claims data obtained from BCBS indicate that Compass Detox provided detox services to Patient 4.  Compass Detox billed approximately $4,326 for this claim.  In July 2019, BAKHSHI provided Patient 4 with drugs to take before dropping the patient off at Compass Detox so that the patient would test positive upon admission.  The patient's admission paperwork confirms that detox was fraudulently billed for this patient, reflecting only "intoxication" (caused by BAKHSHI) as a symptom justifying detox.  Yet, according to Patient 4's billing records, the patient had been in treatment for at least the preceding four months until the day before the patient was admitted to Compass Detox on the basis of a relapse facilitated by BAKHSHI.

c.  Likewise, on or about September 1, 2019, claims data obtained from Aetna indicate that Compass Detox provided detox services to Patient 19.  Compass Detox billed approximately $3,304 for this claim.  DR. LIEBERMAN admitted the patient for detox, even though patient files reflect that, except for about 15 days, the patient had been in treatment at Compass Detox and WAR since on or about January 24, 2019.  Indeed, the patient's admission paperwork from on or about September 1, 2019, indicates that the patient was not eligible for detox, reflecting a statement from the patient that, "Patient states that [patient] is not currently withdrawing because [patient] just recently used and [patient] is on sub maintenance."  In my experience, "sub maintenance" refers to Subutex or Suboxone, a buprenorphine product used in the treatment of opioid addiction.

### Fraudulent Urinalysis Trends and Examples

99.  Witness Statements:  CW1 indicated that SANTEIRO ordered excessive and medically unnecessary urinalyses.[8]  In CW1's view, Compass Detox should have only conducted urinalyses randomly or if they suspected someone of using drugs, but UAs were ordered much more frequently.  CW1 noted that GARNTO owned Laboratory Pros, which itself owned Lab 1. Compass Detox sent UAs to Lab 1.  Likewise, according to CW1, blood work results ordered by Compass Detox were not reviewed by a doctor.

100.  Similarly, CD1 met with WASERSTEIN and J. MARKOVICH as they were setting up Compass Detox.  CD1 explained urinalysis testing to WASERSTEIN and J. MARKOVICH, including advising both of them that the panels run should be tailored to the nature of the patient's addiction.  CD1 got the impression that the pair did not understand the role of urinalysis in

---

[8] And CW1 noted that SANTEIRO gave his son, an employee of Compass Detox and CEO or WAR, his log in information for the EMRs so that his son could sign off on treatment information such as UA results on SANTEIRO's behalf.

treatment, as their questions for CD1 largely focused on how many clients CD1 could send to Compass Detox, how to get patients with the best insurance policies that pay the most money, and how to keep Compass Detox's beds full. Later, both J. MARKOVICH and GARNTO threatened to move urinalysis samples away from CD1's lab if CD1 would not pay for the samples, which CD1 refused to do. GARNTO then moved the account to Lab 1.

101.    CW3 recalled that Compass Detox changed which urinalysis lab they used twice during the time that CW3 worked at Compass Detox. Initially, Compass Detox used a lab whose owner would refer patients to Compass Detox. But since the individual did not refer enough patients to Compass Detox, Compass Detox moved to a different lab.

102.    Trends & Examples: EMRs and billing records confirm, as witnesses described, that Compass Detox and WAR ordered medically unnecessary and excessive urinalyses, billed by the Clinical Labs, including a lab in which GARNTO has a financial interest (Laboratory Pros).

a.  Based on a review of a sample of Compass Detox and WAR patient files, DR. SANTEIRO ordered approximately 100% of confirmatory urinalysis tests identified in the sample.

b.  Approximately 85% of those orders contained the following blanket statement of medical necessity: "It my my [sic] professional opinion the screen test results are not sufficiently detailed to allow me to determine a need for changes in the treatment plan or consider medication management of client's symptoms."

c.  Despite claiming in the statement of medical necessity that the confirmatory testing was needed because the POC screen results were not sufficiently detailed, in approximately 59% of the confirmatory urinalysis orders in the sample, a box was checked for "drug panel screen by EIA." In my experience, "EIA" stands for "enzyme immunoassay," a type of laboratory testing that, like POC screens, only identifies positive or negative results.

d.  Furthermore, for approximately 59% of the confirmatory UAs that DR. SANTEIRO ordered for patients in the sample, there is either no record in the EMRs that DR. SANTEIRO ever reviewed the POC screen results, or, the EMRs indicate that DR. SANTEIRO reviewed the POC results after the confirmatory UA was ordered.

e.  For example, on or about September 6, 2019, claims data obtained from BCBS indicate that Lab 4 conducted a definitive urinalysis test for 15-21 drug classes for Patient 16. Lab 4 billed approximately $2,250 for this claim. This was the eighth of 14 tests ordered by

DR. SANTEIRO every roughly 1-7 days while Patient 16 was in PHP and IOP treatment at WAR, including urinalysis tests ordered by DR. SANTEIRO on September 2, 2019 (four days before the claim referenced above) and September 4, 2019 (two days before the claim referenced above). Although DR. SANTEIRO continuously certified in his medical necessity statement that the POC screen results, which only show whether the patient was positive or negative for substances, were "not sufficiently detailed" to treat the patient, all three orders by DR. SANTEIRO order both a confirmatory test and an additional presumptive screen, without explaining why an additional presumptive screen would be any more detailed than the POC screen. EMRs contain no record that DR. SANTEIRO ever signed off on the results of these three tests, or that the patient's treatment plan was revised within the time period of these three tests to reflect their results.

f.  Likewise, on or about August 25, 2018, claims data obtained from BCBS indicates that Laboratory Pros (GARNTO's lab) conducted a definitive drug test for 22 or more substances for Patient 22. Laboratory Pros billed approximately $4,200 for this claim. On or about August 25, 2018, SANTEIRO ordered a presumptive and definitive urinalysis test following a POC screen for this patient, the third such set of tests ordered by DR. SANTEIRO for this patient within four days. In addition, DR. SANTEIRO ordered presumptive and definitive urinalyses tests following a POC for this patient on August 21, 2018, even though SANTEIRO did not sign off on the POC test results until August 22, 2018, and therefore could not have known whether further, more expensive and precise testing was medically necessary. Despite so many lab tests, there are no documented revisions to this patient's treatment plan. Finally, although this patient was discharged on August 31, 2018 at 9:00 a.m., DR. SANTEIRO ordered a confirmatory UA the same day, and the urine was collected a mere nine minutes before the patient's discharge.

### Fraudulent Chiropractic Trends and Examples

103.  <u>Witness Statements:</u>  According to CW1, Compass Detox referred numerous patients for chiropractic services through a chiropractor that was friends with the MARKOVICH family, even though Compass Detox conducted no physical exam or screen to determine if a patient actually needed chiropractic services. Patient 4, a former Compass Detox patient, also recalled that his/her/their insurance was billed for massage therapy that he/she/they never received, and Patient 5 recalled receiving services but stated that he/she/they did not need them.

104.  <u>Trends & Examples:</u> Patient files and billing records confirm that the chiropractic services supposedly provided by DR. DRAESEL were medically unnecessary.

a.  Out of the approximately 307 distinct patients for whom DR. DRAESEL billed the Insurance Plans for services, approximately 234 of them (76%) were also Compass Detox

patients. In other words, the vast majority of DR. DRAESEL's chiropractic patients reflected in insurance billing records obtained by law enforcement originated from often falsified referral orders from Compass Detox.

b. Approximately 96% of the sample Compass Detox patients with dates of admission in or around April 2018 or later were referred for chiropractic services by Compass Detox.

c. In many instances, the chiropractic referral orders do not document any pain experienced by the patient warranting chiropractic services or do document pain, but contradict other admissions paperwork filled out by Compass Detox staff.

d. For example, on or about December 3, 2018, claims data obtained from BCBS indicate that DRAESEL performed six procedures on Patient 5, totaling approximately $720 billed. This service was supposedly rendered by DR. DRAESEL on December 3, 2018, a day after the patient discharged from Compass Detox and, according to flight records, flew back to New York. Even if this service was somehow provided as billed, Patient 5 told investigators that he/she/they did not have pain and did not need chiropractic services. Indeed, Compass Detox's referral order does not identify any pain experienced by the patient (and in fact, boxes for Back Pain, Neck Pain, Extremity Pain, and Headaches are all blank). Instead, the referral was for "improved overall function." Confirming that this patient had no pain warranting such services, the patient's admission paperwork checks "No" in response to questions about any current, chronic, or reoccurring physical pain and states that his/her/their "pain score" is "0" on a 0-10 scale.

e. Similarly, on or about April 15, 2019, claims data obtained from BCBS indicate that DR. DRAESEL purportedly performed five procedures on Patient 23 totaling approximately $4,395 billed. These procedures included office visits and therapeutic services. According to patient files, on April 14, 2019, a member of the nursing staff signed a chiropractic referral order for Patient 23 for "evaluation and treatment" with respect to "back pain," "neck pain," "headaches/migraines," "improved range of motion and peak performance," and "improved overall function." Yet on the same day, when this patient was screened for pain in an admission assessment, the patient supposedly reported no physical pain at that time and no significant, reoccurring or chronic physical pain the preceding six months.

**Examples of Multiple Trends Affecting Patients' Treatment**

105.    Law enforcement has identified numerous additional examples in the patient files where multiple concerning trends coalesce to mar a given patient's treatment. Two illustrative examples are described herein.

106.    <u>Comprehensive Example 1</u>:  Patient files reflect that Patient 24 was discharged from a second admission to Compass Detox on June 24, 2019, and admitted to WAR the same

day, despite stating in group therapy three days earlier that "when I was at WAR [previously] I stopped doing some of the things that got me clean time." Patient 24 subsequently spent roughly 130 days enrolled for services at WAR, where seven (over one-third) of the patient's urine samples conducted in response to DR. SANTEIRO's orders reflected indicators of invalidity, such as pH levels outside the normal range. The patient's EMRs do not reflect that this was ever addressed with the patient and the patient was discharged "successfully."

107.    Three days after discharge from WAR, DR. LIEBERMAN readmitted Patient 24 to Compass Detox for detox treatment, which is meant for individuals who are physically dependent on substances and are experiencing withdrawal symptoms, not for someone who had just successfully completed months of outpatient services. The patient's intake paperwork reflects that he/she/they sought treatment at Compass Detox not because the patient was eligible for detox, but because the patient wanted "to get off the streets" because they had been "kicked out" of their sober home. Ironically, DR. LIEBEMAN's admission order identifies "failure at outpatient level of care" as one of the justifications for admission, even though WAR's records said the patient completed outpatient care "successfully." DR. LIEBERMAN's admission order does not even check off the box for "requires detox to establish and or to stabilize medication regimen and implement a treatment plan."

108.    Comprehensive Example 2:    Patient 25 is among the top five highest utilized patients at Compass Detox and WAR, according to billing records obtained by law enforcement. In total, Compass Detox and WAR billed approximately $900,814 for services purportedly provided to this patient, while Clinical Labs billed approximately $211,701 for testing purportedly conducted during this patient's stays at Compass Detox and WAR. This patient was recycled to Compass Detox thirteen times and experienced many of the concerning trends reflected above.

47

a. During this patient's second admission to Compass Detox, five of the patient's eight UAs—all five of which were ordered and signed off on by DR. SANTEIRO—reflected results suggestive of invalid urine, which the EMRs do not show was ever addressed with the patient. In addition, the patient was absent for or did not participate in the majority of his/her/their group therapies, yet was discharged as having "successfully" completed treatment.

b. In this patient's fourth admission to Compass Detox, a file note from the day before the patient was discharged states that the patient was at "very high risk of relapse," "absent for majority of group therapies," "declined family session," had "shown minimal progress," "demonstrated a low level of motivation," "engage[d] in med seeking behaviors," and "don't fuck with" a sponsor. Nonetheless, the patient was discharged as having successfully completed treatment.

c. During the patient's eighth admission to Compass Detox, the patient again supposedly "successfully" completed treatment then was transferred to WAR for outpatient treatment. In the patient's WAR admission paperwork, the patient supposedly stated that he/she/they consumed alcohol and cocaine on days that patient files reflect that the patient was in treatment at Compass Detox. The patient was later administratively discharged from WAR—without further explanation in the discharge paperwork—and sent back to Compass Detox for the ninth time, where admission paperwork indicates that the patient had relapsed while at WAR.

### 3.   **Additional Evidence of Substance Abuse Treatment Fraud**

109.    Beyond patient files and billing records, prescription drug monitoring program ("PDMP") data, DCF and Department of Health documents, banking, and other records corroborate and provide further evidence of the scheme.

### **Improper Buprenorphine Prescriptions Reflected in PDMP Data**

110.    According to PDMP data, both DRS. SANTIERO and LIEBERMAN prescribed buprenorphine in bulk to Compass Detox patients, and they did so under their DEA licenses, not their Practitioner/DW licenses which are supposed to be used for such prescriptions. This is problematic because Practitioner/DW licenses allow doctors to treat a specific number of patients with buprenorphine, but bulk prescriptions to an entity obscure those patient limits.

111.    DR. SANTIERO wrote approximately 88 prescriptions for approximately 12,420 pills of buprenorphine to Compass Detox as a patient (*i.e.*, the "patient" to whom the prescription

was written was an entity, not an individual patient), while DR. LIEBERMAN wrote

approximately 61 prescriptions for approximately 13,145 pills of buprenorphine to Compass Detox

as a patient.

112.    Even more alarming, both DRS. SANTEIRO and LIEBERMAN prescribed

buprenorphine to Compass Detox patients, while those patients already had unexpired

prescriptions from other doctors. Title XLVI, Florida Statutes, Chapter 893.055(8) requires a

prescriber to consult the prescription drug monitoring system "to review a patient's controlled

substance dispensing history before prescribing or dispensing a controlled substance" to an adult

patient. This requirement exists to avoid the issuance of overlapping prescriptions which can lead

to diversion of controlled substances. For example:

    a.  For example, for Patient 19, DR. LIEBERMAN wrote a prescription on August 17, 2019 for buprenorphine 2mg table SL for 90 tablets, intended to last 30 days. The prescription was filled using commercial insurance on August 17, 2019, meaning that it would expire on September 16, 2019. But on August 28, 2019, DR. SANTEIRO wrote an overlapping prescription for buprenorphine 2mg tablet SL for 15 tablets, intended to last for 5 days. This was paid for with "private pay," which, in my experience means cash or credit card.

    b.  Furthermore, for Patient Broker 1, an unrelated doctor prescribed buprenorphine 8mg tablet SL on August 9, 2019 for 30 tablets, intended to last 30 days. The prescription was filled August 9, 2019 and therefore would have expired September 8, 2019. However, on August 22, 2019, DR. SANTEIRO wrote a prescription for buprenorphine 8mg tablet SL for 45 tablets, intended to last 30 days.

    c.  Likewise, for Patient 26, DR. LIEBERMAN wrote a prescription on or about January 29, 2019 for a 30-day supply of buprenorphine 2mg tablet SL, consisting of 60 tablets. As this prescription was filled on January 29, 2019, the supply would have lasted until February 28, 2019. However, on February 15, 2019, DR. SANTEIRO wrote the same patient another prescription for a 30-day supply of buprenorphine 2 mg tablet SL, consisting of 30 tablets. The first prescription was paid with commercial insurance, while the second was paid with "private pay."

113.    These overlapping prescriptions, of which these are just three non-exhaustive

examples, are cause for real concern. In her review of patient files, billing records, and PDMP

data, Dr. Clark found that DRS. SANTEIRO and LIEBERMAN overutilized the most abusable

version of buprenorphine. It is the standard of care to prescribe the combo product (buprenorphine plus naloxone, "Suboxone") for patients unless they are pregnant or have documented allergies. The mono product ("Subutex") does not contain the blocker and is not an abuse deterrent formulation. It has higher street value, is more likely to be used intravenously, and therefore should not be the formulation used for most patients. LIEBERMAN and SANTEIRO used the less appropriate mono product, Subutex, at a ratio of approximately 11:1 to the preferred abuse deterrent formulation combo product.

### Improper Compounding of Medications at Compass Detox

114.    Although Compass Detox maintains an Institutional Class II Type B pharmacy license, this license does not authorize Compass Detox to create compound medications. The "Comfort Drink" therefore was compounded in violation of Florida law. Patient files reflect that the comfort drink consisted of a combination of different medications which changed over time, but some examples documented in patient files include the following mixtures: (a) benadryl 25mg, phenergan 25mg; (b) Vistaril 50mg, Zanaflex 2mg, phenergan liquid 10cc; (c) propranolol, bentyl, and/or Benadryl; and (d) propranolol and bentyl.[9]  As reflected above, CW10, the pharmacy consultant, flagged this for Compass Detox multiple times but the issue went unaddressed.

### Certain Defendants' Representations to DCF

115.    Without DCF licensure, the Insurance Plans would not have paid for any services billed by Compass Detox or WAR. As described below, several defendants, among other individuals, were involved in securing DCF approvals for Compass Detox and WAR.

    a.  DCF requires the CEO of any substance abuse facility licensed through them to sign off on the facility's policies and procedures. J. MARKOVICH and D. MARKOVICH were both, at various times, CEO of Compass Detox, whose policies and procedures impose

---

[9] I understand that Benadryl, phenergan, and Vistaril are antihistamines; Zanaflex and bentyl are muscle relaxants; and Propanolol is a beta blocker.

substantial obligations on the CEO, including "full responsibility for the overall operation" and approval of "medical protocols."

b. Likewise, DCF records reflect that J. MARKOVICH wrote letters to DCF certifying that Compass Detox was complying with Florida regulations and promising to ensure that Compass Detox "will have a safe, compliant, and nurturing environment" for patients.

c. Furthermore, in a Medical Director Agreement signed by J. MARKOVICH and DR. SANTEIRO dated on or about December 9, 2016, DR. SANTEIRO agreed to ensure Compass Detox's compliance with federal and state law, oversee operations, co-chair utilization review activities, develop medical policies, and assure completion of all physician documents. Consistent with these obligations, DR. SANTEIRO's signature appears on a letter submitted to DCF in January 2020 representing that that Compass Detox in fact complies with applicable laws.

d. DCF records reflect that, on or about December 19, 2018, WASERSTEIN emailed a DCF representative, providing a copy of WAR's policies and procedures for DCF review and noting that these policies were "identical to other policy and procedures already approved by your department," and offering to provide any assistance needed to "expedite this matter," *i.e.*, WAR's licensing. WASERSTEIN noted that "[w]e are very anxious to open and begin our work in helping the community. We have numerous patients waiting for us to open and seek treatment." As relevant here, these policies and procedures contained requirements for individualized treatment plans and minimum therapy requirements.

## D. EVIDENCE OF MONEY LAUNDERING

### 1. Conspiracy to Commit Money Laundering

116.   WASERSTEIN, J. MARKOVICH, GARNTO, and others conducted, and conspired to conduct, financial transactions, including (1) monetary transactions greater than $10,000 in criminally derived proceeds, and (2) financial transactions to disguise the fact that they funded lavish personal expenditures with the proceeds of health care and wire fraud, *i.e.*, the nature, source, control, and ownership of certain funds. They accomplished this by moving proceeds from various Compass Detox and WAR corporate accounts, which J. MARKOVICH controlled, to various companies created or managed by WASERSTEIN, J. MARKOVICH, and GARNTO.

117.   On or about September 26, 2017, account x3275 was opened in the name of Compass Detox. J. MARKOVICH is the current signatory. Since its opening, account x3275 has

received approximately $30,380,617 in funds from private insurers, including the Insurance Plans.

As described above, much of these deposits are proceeds of health care offenses and wire fraud.

118.    Companies managed by J. MARKOVICH and WASERSTEIN have received

substantial funds from account x3275, as reflected below.

a. **Waterstone Capital Management:**   Roughly every month, Waterstone Capital Management, which is managed by WASERSTEIN, received an approximately $30,000 payment via check from Compass Detox typically styled as a "profit distribution," as well as larger end-of-year distributions.  For example, on or about December 12, 2018, J. MARKOVICH signed check no. 5726 in the amount of $480,000 from account 3275 in the name of Compass Detox to Waterstone Capital Management.  In total, Waterstone Capital Management has received at least $1,206,000 via check from Compass Detox.  Banking records for Waterstone Capital Management account ending in x3551, of which WASERSTEIN is a signatory, reflect these deposits and confirm that this account is used for personal or business expenses unrelated to the treatment of substance abuse patients.

b. **Asakim 18:**  Roughly every month, Asakim 18, which is managed by J. MARKOVICH, received an approximately $30,000 payment via check from Compass Detox styled as a monthly "profit distribution," as well as larger end-of-year distributions.  For example, on or about December 12, 2018, J. MARKOVICH signed check no. 5727 in the amount of $480,000 from account 3275 in the name of Compass Detox to Asakim 18.  In total, Asakim 18 has received at least $1,206,000 via check from Compass Detox.  Banking records for Asakim 18 account ending in x8632, of which J. MARKOVICH is a signatory, reflect these deposits and confirm that this account is used for personal or business expenses unrelated to the treatment of substance abuse patients.

c. **Waterstone Healthcare Management:**  Roughly every month, Waterstone Healthcare Management, which is jointly managed by Asakim 18 and Waterstone Capital Management, received monthly payments (ranging from $50,000 to $100,000) via check from Compass Detox styled as a monthly "management fee."  For example, on or about December 31, 2018, J. MARKOVICH signed check no. 5776 in the amount of $200,000 from account 3275 in the name of Compass Detox to Waterstone Healthcare Management. In total, Waterstone Healthcare Management has received at least $3.3 million via check from Compass Detox.  Banking records for Waterstone Healthcare Management account ending in x9200, of which J. MARKOVICH is a signatory and relatives of J. MARKOVICH and WASERSTEIN are cardholders, reflect these deposits and confirm that this account is used for personal expenses unrelated to substance abuse treatment.

d. **Right Direction Recovery:**  Roughly every month, Right Direction Recovery, which is managed by J. MARKOVICH and WASERSTEIN, received approximately $100,000 via check from Compass Detox styled as a monthly "consulting fee."  For example, on or about December 31, 2018, J. MARKOVICH signed check no. 5779 in the amount of $500,000 from account 3275 in the name of Compass Detox to Right Direction Recovery.  In total,

Right Direction Recovery has received at least $3 million via check from Compass Detox. Banking records for Right Direction Recovery account ending in x9122, of which both WASERSTEIN and J. MARKOVICH are signatories, reflect these deposits and confirm that this account is used for personal expenses unrelated to substance abuse treatment.

119.  GARNTO used accounts x2226 and x3563 held in the name of Recovery Empire and Mended Bridge Investments to conceal profits from Laboratory Pros and WAR.  For example, on October 11, 2019, J. MARKOVICH signed check no. 001138 in the amount of approximately $44,776 from account number x8858 in the name of WAR to Recovery Empire.  In total, Recovery Empire has received approximately $147,830 from Compass Detox and WAR and Mended Bridge has received approximately $318,766.  The assets in these accounts are used to fund GARNTO's personal expenditures, as well as kickback payments to other recruiters and patients.

120.  Beyond the use of shell companies to funnel large sums out of Compass Detox and WAR, J. MARKOVICH and WASERSTEIN also utilized Ness Group Foundation, a supposed non-profit organization for which they (along with D. MARKOVICH) are directors, to secure two loans that WASERSTEIN then used in his real estate business.  Specifically:

a.  On or about December 26, 2018, J. MARKOVICH signed check no. 5755 in the amount of $1,000,000 from account x3275 in the name of Compass Detox to Ness Group Foundation.  The check's memo reads "charitable contribution."  This check was deposited on December 31, 2018 in Ness Group Foundation's money market account x9575.  On February 22, 2019, WASERSTEIN was approved for a $1,000,000 line of credit no. x7850 to be extended to Jade Holdings for "investment purposes," including "Real Estate Investment."  This line of credit was collateralized by Ness Group Foundation's money market account.  On February 22, 2019, a portion of the line of credit (approximately $775,674.69) was deposited as an "advance from new loan" in Jade Holdings' account, the bulk of which (approximately $772,174.69) was immediately transferred by wire to Company 1, of which WASERSTEIN as a director.

b.  Likewise, on June 26, 2019, J. MARKOVICH initiated a $1,000,000 wire transfer from Compass Detox account x3275 to Ness Group Foundation's account x8769 as a "contribution."  The next day, on June 27, 2019, J. MARKOVICH and WASERSTEIN invested the $1,000,000 in a certificate of deposit ("CD") account x2971.  This CD was then used to collateralize a $1,000,000 line of credit under loan number x0090 with a loan date of June 27, 2019.  According to the loan documents, the purpose of the loan was to finance "working capital needs for a real estate investment company in Miami, FL.  These

working capital needs will include the purchase of various real estate properties in Miami, along with other related expenses they may incur." The loan proceeds were transferred to Company 1, which later repaid the loan.

121.   In total, whether through payroll, or other payments, either to personal accounts or to accounts held in the name of their companies, J. MARKOVICH, WASERSTEIN, and GARNTO had access to the following sums from Compass Detox and/or WAR over the course of the conspiracies:

| Defendant Name | Approx. Total Receipts |
|----------------|------------------------|
| J. MARKOVICH | $11.2 million |
| WASERSTEIN | $8.9 million |
| GARNTO | $1.7 million[10] |

### 2. Substantive Money Laundering

122.   WASERSTEIN also knowingly engaged in monetary transactions in criminally derived property greater than $10,000, knowing that the property was derived from a specified unlawful activity.

123.   For example, on or about December 17, 2018, WASERSTEIN signed check no. 1107 in the amount of approximately $200,000 from account number x3551 in the name of Waterstone Capital Management to Company 2, of which documents on file with the Florida Secretary of State indicate WASERSTEIN is a manager. WASERSTEIN deposited the check in Company 2's account number x9115, then, the same day, signed check no. 1403 in the amount of approximately $200,000 from account number x9115 in the name of Company 2 to "Richard Waserstein."

---

[10] This includes the approximate $635,000 value of a property quit claimed to GARNTO by a company managed by WASERSTEIN. This excludes proceeds from Laboratory Pros, discussed above in this Affidavit at Paragraph 76.

124.    In addition, on or about February 28, 2019, WASERSTEIN signed check no. 1002 in the amount of approximately $638,259 from account number x9122 in the name of Right Direction Recovery to Company 1, of which, as described previously, Florida Secretary of State records indicate WASERSTEIN is a director. WASERSTEIN deposited this check on or about March 1, 2019 in Company 1's account x2369.

## E. EVIDENCE OF J. MARKOVICH'S FALSE STATEMENTS TO A FINANCIAL INSTITUTION, BANK FRAUD, AND WIRE FRAUD

### The Paycheck Protection Program

125.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

126.    In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

127.    A PPP loan application must be processed by a participating lender.  If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by Small Business Administration ("SBA").  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

128.    PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

### Relevant PPP Lender

129.    Lender 1 is a federally insured financial institution based in Florida.

### Overview of the Fraud

130.    As described further below, evidence gathered in the investigation demonstrates that, from in or around April 2020 through in or around May 2020, J. MARKOVICH submitted, or caused to be submitted, fraudulent loan applications to Lender 1 to obtain funds through PPP.

131.    In connection with this fraud, the following PPP loan applications were submitted by J. MARKOVICH to PPP Lender 1:

| Name of Business Applicant | Approx. Amount Sought | Lender | Approx. Date | Status |
|---|---|---|---|---|
| Compass Detox | $511,807 | Lender 1 | 4/24/20 | Funded |
| WAR | $46,455 | Lender 1 | 4/24/20 | Funded |

## Manner and Means

132.    According to banking records, on or about April 24, 2020, Lender 1 received a PPP application in the name of Compass Detox seeking a PPP loan in the amount of approximately $511,807. The application was submitted in the name of J. MARKOVICH, who represented himself to be an owner of Compass Detox.

133.    The PPP application submitted to Lender 1 included numerous representations, including a representation that Compass Detox employs 70 individuals with an average monthly payroll of approximately $259,725 and that "[t]he Applicant is not engaged in an activity that is illegal under federal, state or local law."

134.    Based on this and other information provided to Lender 1 in Compass Detox's PPP application, Lender 1 approved and funded the PPP loan. On or about May 6, 2020, approximately $511,807 was transferred to a bank account held in the name of Compass Detox at Lender 1.[11]

135.    Likewise, according to banking records, on or about April 24, 2020, Lender 1 received a PPP application in the name of WAR seeking a PPP loan in the approximate amount of $46,455. The application was submitted in the name of J. MARKOVICH, who represented himself to be an owner of WAR.

136.    The PPP application submitted to Lender 1 included numerous representations, including a representation that WAR employs 26 individuals with an average monthly payroll of approximately $49,137 and that "[t]he Applicant is not engaged in an activity that is illegal under federal, state or local law."

---

[11] Bank records show that, prior to the deposit of the PPP loan proceeds into this account, the balance of the Compass Detox account was approximately $0.

137.    Based on this and other information provided to Lender 1 in WAR's PPP application, Lender 1 approved and funded the PPP loan. On or about May 7, 2020, approximately $46,455 was transferred to a bank account held in the name of WAR at Lender 1.[12]

138.    As described above in this affidavit, J. MARKOVICH was knowingly and willingly participating in health care fraud, wire fraud and kickback conspiracies at the time he signed these applications, and accordingly, there is probable cause to believe that his certifications to Lender 1 were false and fraudulent.

## CONCLUSION

139.    Based upon the foregoing, I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from on or about April 1, 2017, and continuing through the date of this affidavit, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, DR. JOSE SANTEIRO, DR. DREW LIEBERMAN, and DR. JEFFREY DRAESEL, JR., together with employees and associates of Compass Detox, WAR, laboratory personnel, and others known and unknown, conspired to commit (a) health care fraud, that is, to knowingly and willfully execute, and attempt to execute, a scheme to defraud any health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody and control of, any health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347, and (b) wire fraud, that is, having devised a scheme or artifice to defraud, transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds

---

[12] Bank records show that, prior to the deposit of the PPP loan proceeds into this account, the balance of the WAR account was approximately $0.

for the purpose of executing such scheme or artifice; all in violation of Title 18, United States Code, Section 1349.

140.    I further submit that there is probable cause to believe that, from on or about October 25, 2018, and continuing through the date of this affidavit, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, RICHARD WASERSTEIN, JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, ELAN BAKHSHI, MARIO KUSTURA, and FRANCISCO BOSCH, together with employees and associates of Compass Detox, WAR, laboratory personnel, and others known and unknown, conspired to (a) knowingly and willingly solicit and receive remuneration (including kickbacks, bribes, and rebates) directly and indirectly, overtly and covertly, in cash and in kind, in return for referring a patient and patronage to a recovery home, clinical treatment facility, and laboratory; and (b) knowingly and willingly paid and offered to pay remuneration (including kickbacks, bribes, and rebates) directly and indirectly, overtly and covertly, in cash and in kind to induce a referral of an individual to a recovery home, clinical treatment facility, and laboratory, and in exchange for an individual using the services of that recovery home, clinical treatment facility, and laboratory, in violation of Title 18, United States Code, Section 220; all in violation of Title 18, United States Code, Section 371.

141.    I further submit that there is probable cause to believe that, from on or about April 1, 2017, and continuing through the date of this affidavit, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, RICHARD WASERSTEIN, JONATHAN MARKOVICH, CHRISTOPHER GARNTO, together with employees and associates of Compass Detox, WAR, laboratory personnel, and others known and unknown, conspired to (a) conceal and disguise the nature, the location, the source, the ownership, or the control of the proceeds of

59

specified unlawful activity, that is, health care fraud offenses and wire fraud, knowing the transaction was designed in whole or in part to do the same; and (b) knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and derived from specified unlawful activity, that is, health care fraud offenses and wire fraud.

142.    I further submit that there is probable cause to believe that, from on or about April 1, 2017, and continuing through the date of this affidavit, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, RICHARD WASERSTEIN did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and derived from specified unlawful activity, that is, health care fraud offenses and wire fraud.

143. I further submit that there is probable cause to believe that on or about April 24, 2020, in Broward and Miami-Dade Counties, J. MARKOVICH knowingly committed (a) the crime of false statements to a financial institution, that is made a false statement or report to an institution the accounts of which are insured by the FDIC, in violation of Title 18, United States Code, Section 1014; and (b) bank fraud, that is executed or attempted to execute a scheme or artifice to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises, in violation of Title 18, United States Code, Section 1344(2).

FURTHER AFFIANT SAYETH NAUGHT.

ALBERTO BHOGE
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me telephonically
this 25th day of September, 2020.

HON. PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE

61